[Civ. No. 14584. First Dist., Div. One. June 5, 1951.]

W. J. WYSOCK, Respondent, v. BORCHERS BROS. (a Co-partnership) et al., Appellants.

Campbell, Hayes & Custer, Frank L. Custer and Edward J. Niland for Appellants.

James F. Boccardo and David S. Lull for Respondent.

WOOD (Fred B.), J.—Defendants appeal from the judgment rendered against them in an action for damages for personal injuries sustained by plaintiff when his automobile was hit by a cement truck owned by the defendants Borchers Bros., and driven by their employee, defendant Bidar. They appeal, also, from an order denying their motion for a new trial.

Appellants claim the judgment should be reversed for these reasons, asserted by them: (1) As a matter of law, the negli-

gence of the respondent contributed proximately to his own injury, (2) the trial court erroneously refused to strike certain evidence, and (3) the trial court erroneously refused to give certain instructions requested by appellants.

In respect to their first point, appellants concede that if respondent's testimony is worthy of belief the evidence supports the verdict. They claim that certain photographs in evidence, taken of the vehicles after the accident, demonstrate conclusively that the collision could not conceivably have taken place where respondent said it did, and render respondent's account of the movements of his car and of other vehicles inherently improbable and entitled to no weight whatsoever. Before considering these photographs, it is desirable to give a brief résumé of the other evidence in the case.

The collision occurred on the morning of November 10, 1947, at the intersection of Lincoln Avenue and San Carlos Street, in San Jose. San Carlos Street is an east-west arterial, 77 feet 6 inches wide, with a center dividing strip 13 feet 6 inches wide. The roadway on either side of the center strip is divided into two traffic lanes. The outer lane next to the curb is 19 feet 6 inches wide; the inner lane, 12 feet 6 inches wide. The center strip does not extend into the intersection with Lincoln Avenue. Where the center strip terminates on either side of the intersection, there is a raised traffic island, with a guardrail on the end away from the intersection and a sign on the end toward the intersection. Lincoln Avenue runs north and south. North of San Carlos Street the paved portion of Lincoln Avenue is 26 feet wide and is divided into two lanes, the west lane being 9 feet and the east lane 17 feet wide. There was an arterial stop sign on Lincoln Avenue, about 10 feet north of the north curb line of San Carlos. Respondent's car was moving southerly on Lincoln toward San Carlos, and appellants' truck westerly on San Carlos toward Lincoln.

Respondent testified that he came south on Lincoln Avenue at about 25 or 26 miles an hour, stopped at the stop sign, looked east and west to observe traffic on San Carlos; saw a bread truck parked on the northeast corner of the intersection, which obscured his vision; put his car into low gear and moved about 6 feet beyond the stop sign, and saw two or three passenger cars approaching him from the east in the outer lane of San Carlos, the cars being about 100 to 150 feet away, and appellants' truck in the inner lane about two car lengths behind the lead passenger car; that those vehicles

were then traveling at about 25 to 30 miles an hour; that he then proceeded into the intersection, in low gear, at about 2 miles per hour, and as he was crossing the dividing line of the lanes in the north side of San Carlos he observed that the cars approaching him in the outer lane had decreased their speed to 5 or 10 miles, and thought that the truck in the inner lane was slowing to the same speed as the cars; that the truck and the cars were then about 60 to 70 feet from the intersection; that respondent then continued through the intersection at about 4 or 5 miles an hour, looked to his right and saw some cars coming from the west on the south side of San Carlos about 20 or 30 feet from the intersection. He moved forward, intending to stop between the traffic islands, shifted into second gear and increased his speed to about 6 miles an hour. When his car was well into the inner lane on the north side of San Carlos (about ready to go into the space between the traffic islands), just west of the center line of Lincoln, he saw the truck out of the corner of his eye, about 10 feet away, and then there was a crash. He did not recall whether the impact shoved his car west or ahead or anywhere else, but that it seemed as though it shoved him west; that after the accident his car was facing south. He also testified that the impact must have pushed his car into the signpost on the westerly traffic island because the car did not previously have a dent in the right front fender, but that he did not know whether his car hit the signpost and did not recall exactly where his car ended up after it was shoved west; that he was dazed by the collision but did not become unconscious, and that he pulled himself out of the car and sat on the running board until he was taken to the hospital. Upon the taking of his deposition, respondent had testified that he first came to a complete stop with his front wheels within a foot or so of the northerly curb on San Carlos (which would be about 10 feet south of the stop sign); in explanation thereof, at the trial, he said he had thought the stop sign was about a foot or two from the curb or gutter. Upon his deposition, he testified he did not see the truck until he had moved into the outer lane, and that the truck at that time was 60 or 70 feet away; at the trial, he testified that the deposition was in error in this regard, and that he was in the parking lane (just north of the outer traffic lane) when he first saw the truck.

Appellant Bidar testified that he turned west into San

Carlos from Sunol Street (parallel to and one block east of Lincoln), entering the inner lane on the north side of San Carlos; that as he approached Lincoln he was traveling 18 to 20 miles an hour, and when about 10 feet from the intersection he began to cut into the outer lane, after looking into his rearview mirror, and observing no vehicle behind him. Later, during the trial, he said he was 10 feet from the intersection when he completed getting into the outer lane. Upon deposition, he testified he had turned into the outer lane about 30 feet from the intersection. He said that at that time all the vehicles ahead of him had passed the intersection of Lincoln and San Carlos, and he observed none behind him; that as he completed his move into the outer lane his rear left duals were on the white center line; he looked to his right and saw no vehicles, continued on, and first saw respondent's car coming into the intersection at a point 6 feet south of the stop sign on Lincoln and just west of the center of Lincoln, at a speed of 25 to 30 miles an hour. Later, he testified that he first saw respondent when the latter was opposite the stop sign and near the west curb of Lincoln; upon deposition, that respondent was then right in front of Bidar, about the middle of the north side of San Carlos. At that time, the truck was 3 or 4 feet into the intersection and in the southerly portion of the outer lane of San Carlos. Bidar said he immediately swung his truck to the left and applied his brakes, and that respondent's car swung into the westerly crosswalk and then swerved back in an easterly direction. Bidar located the point of impact near the northeast corner of the westerly traffic island, that is, that the front of respondent's car was about a foot away from that corner of the island, right alongside the island. The right side of the truck's bumper hit respondent's car about in the middle. He did not recall whether either vehicle moved from the point of impact; they were in contact when they came to rest; then Bidar backed the truck up 2 or 3 feet.

One Gebhart, a bystander, testified that he observed respondent's car coming south on Lincoln Avenue at about 30 miles an hour; that it did not slow down at any time before the collision; that as he watched it he caught a glimpse of the truck but did not see the latter long enough to estimate its speed. He located the point of impact at about the center of the outer lane of San Carlos Street and the westerly pedestrian crosswalk which extends north and south across San Carlos (some 20 feet north of the westerly traffic island).

But, in a writing signed by him a day or two after the accident, these statements appeared concerning respondent's car: "I did not see the passenger car before it was in San Carlos," and "The car was going about twenty-five to thirty miles per hour, from its speed and my driving experiences I am confident it did not come to a stop before entering San Carlos. Then I heard a crash and turned around and saw a man get out of the right front door and sit down on the running board"; and this statement concerning appellants' truck, "I can't say whether or not I saw the transit mix before the accident." Upon the trial, he said he answered some questions which were written down and read to him; that he did not read the statement but it was read to him and he signed it.

Another bystander, Huebner, testified that he noticed the truck approaching from the east in the outer lane of San Carlos Street about half a block away from the intersection and that there were no other vehicles between the truck and the intersection; that he saw respondent's car coming into view on Lincoln Avenue at a speed of 30 to 40 miles an hour; that the brakes were applied to it and the car skidded about 8 feet in the gravel at the side of the street, its speed reducing to 20 to 25 miles per hour; that the brakes were then released and the car continued at this speed into the intersection without stopping. He said he saw the truck approaching at not exceeding 20 miles an hour, and then the truck and the car came together; that as they met the front duals of the truck were almost on the easterly line of the west north-south crosswalk and the front of respondent's car was about 3 feet from the westerly traffic island. An investigating highway patrol officer, Lee, testified that shortly after the accident Huebner told him that he, Huebner, did not see respondent drive through the stop sign and did not see respondent's car before the impact. Huebner testified that he told Lee that he saw respondent's car come into the intersection without stopping, and saw the accident.

Officer Lee arrived on the scene soon after the accident. He placed respondent's car, as he found it, diagonally across the westerly north-south pedestrian crosswalk and the inner lane of San Carlos, pointing southeasterly, the right front of the car about 8 feet east of the westerly traffic island. He said the truck was facing the left side of respondent's car, a few feet from it, facing in a southwesterly direction, strad-

dling the inner and outer lanes of San Carlos, with its left front wheel in the inner lane and its right front wheel in the outer lane next to the dividing white line. In his notes he had indicated the point of impact as 12 feet west of the center line of Lincoln Avenue and about 21 feet south of the stop sign (which would put it in the outer lane of San Carlos and about 5 feet east of the easterly line of the westerly north-south crosswalk). However, his point of impact was based upon an assumption that certain tire marks which he traced were made by respondent's car. He was not positive whether those tire marks were made by respondent's car. He said he had no way of determining when those tire marks were made and so was not in a position to say they were made by respondent's car. He said he did not actually know what the point of impact was; it could have been further to the west or to the east than he had assumed it to be; he did not know whether or not the impact was at or near the traffic island.

Appellants claim that the photographs (Exhibits A to E, incl., particularly A and D) demonstrate that the truck was in the outer lane of San Carlos as it entered the intersection. That fact, in turn, demonstrates, they say, (1) that respondent was clearly guilty of contributory negligence in attempting to pass in front of the truck, if the truck was in the outer lane, and (2) that respondent's testimony concerning the movement of his car and the movement of other vehicles was inherently improbable and physically impossible.

How do these photographs demonstrate that the truck was in the outer lane as it entered the intersection? The angle of the truck and the tire marks behind the truck (as shown in Exhibit D) forcefully demonstrate this fact, say the appellants. They claim that the photographs establish the point of impact some 15 or more feet north and west of where the plaintiff located it.

These photographs (Exhibits A to E) were shown to Officer Lee. He said they depicted the vehicles involved in this accident; that they generally depicted the position of the cars, taken at different angles at the scene of the accident; he did not know when these pictures were taken; he could not say that these pictures portray the position of those vehicles; he did not see them taken and had no independent recollection of where they were taken. There is nothing in the record to show when or where or by whom these several photographs

were taken. For aught that appears, Exhibits A and B depict respondent's car near the traffic island and in about the position Officer Lee described it and located it on a map, as observed by him after the accident. That is approximately where Bidar and Huebner said it was at the time of the impact and in the same north-south position but about 14 feet west of where respondent said it was at the time of the impact. The fact that the passenger car was hit broadside and was extensively damaged by a truck which with its load weighed 13 tons, furnished the jury a basis for an inference that the car was shoved westward. If we assume the jury drew that inference (we may assume it did), neither Exhibit A nor Exhibit B demonstrates that the point of impact as described by respondent was inherently improbable or physically impossible.

Exhibit D, upon which appellants also rely, is equally inconclusive. It was taken from the rear of the truck, apparently at a point in the northerly portion of San Carlos Street, east of the intersection, looking west. It shows the truck in the intersection, pointing at a slight angle southwesterly toward the passenger car. But the picture must have been taken after Bidar had backed the truck away from the car. We cannot be certain of the distance between the vehicles. Bidar said 2 or 3 feet. Officer Lee said several feet; he was not certain as to the exact distance. Exhibits A, B, and C, showing side views of the front of the truck, suggest that Bidar may have backed it appreciably more than 3 feet. And there is no evidence concerning the direction in which he backed it, i.e., whether along the course it first traveled or a different course. Nor can we say that the marks leading back, perhaps a couple of feet, from the rear duals of the truck in Exhibit D, if tire marks, were made by this or some other vehicle. Officer Lee, asked if certain tire marks shown in Exhibit E (precisely what marks, the record does not show) were those he had observed, said "I just can't recall whether those were the exact tire marks, or not." This evidence (which the jury considered and weighed with the other evidence in the case) is quite inconclusive, certainly falls far short of demonstrating that respondent's testimony was inherently improbable and, as a matter of law, unworthy of belief. Instead, these photographs illustrate the aptness of the observation that "Perhaps there is nothing more certain about an automobile accident than the fact that the visible results afterward are not an infallible guide in determining what

occurred.'' (*Hawthorne* v. *Gunn,* 123 Cal.App. 452, 455 [11 P.2d 411]; see, also, *Brown* v. *Jack & Jeff Transfer Co.,* 102 Cal.App.2d 559, 565 [228 P.2d 323].) We conclude that the evidence supports the verdict and that there is no basis for holding, as a matter of law, that respondent committed negligence which was a contributing cause of the injuries sustained by him.

The evidence which appellants claim should have been stricken related to the fact that Bidar, who operated the truck at the time of the accident, did not possess a chauffeur's or a driver's license. Appellant Bidar was being examined by respondent under the provisions of section 2055 of the Code of Civil Procedure. The following questions were asked, answers given, and motions and rulings made: ''BY MR. LULL [attorney for respondent]: Q. Now, Mr. Bidar, on the 10th day of November, 1947, you neither possessed a chauffeur's or driver's license, did you? A. That is right. Q. You didn't have a chauffeur's license? A. That is right. Q. Didn't have a driver's license? MR. CUSTER [attorney for appellants]: I am going to object as incompetent, irrelevant, and immaterial, your Honor, move to strike the answer as incompetent, irrelevant, and immaterial. MR. LULL: I think that there are numerous cases to the effect that when a person drives a commercial vehicle they are supposed to be possessed of a certain degree of skill and——— THE COURT: Objection is overruled. Q. To clarify your answer again, you had neither a chauffeur's nor a driver's license, did you? A. That is right. MR. LULL: No further questions. MR. CUSTER: That is all at this time.''

After respondent rested and before putting on evidence of their own in chief, appellants moved to strike those questions and answers, and requested the court to admonish the jury to disregard them. The court denied this motion upon the authority of *Moore* v. *Re,* 131 Cal.App. 557 [22 P.2d 45].

Later, upon direct examination, Bidar testified that while in the Army he operated motor vehicles of a type similar to the truck involved in this accident, did so from the latter part of 1941 until he got out of the Army in 1945; that he had his Army driver's license; that he went to work for Borchers Bros. in 1946 and had been driving this type of equipment since then; that he took the state examination for a license and passed it but had not, prior to this accident, been able to get his license because he did not have a vehicle to use in

making the required driving demonstration; that a few days after this accident he took the driver's demonstration test and got his chauffeur's license.

Upon the conclusion of the taking of testimony, appellants again made, and the court denied, a motion to strike all evidence concerning whether or not Bidar had an operator's or chauffeur's license.

Respondent contends that the motion to strike came too late, because the question was twice asked and answered before an objection was interposed. It is true that when a question is asked which clearly shows the answer sought to be elicited, an objection is deemed waived if not timely made. However, there may be circumstances (as when the answer comes before an objection can be interposed) when the doctrine of waiver is not reasonably applicable. Here, the delay in making the objection was slight. Counsel for respondent met the issue and the court decided the motion on the merits. There is implied a finding by the court that the delay occurred under circumstances which negatived a waiver. Respondent should not be permitted now to claim a waiver. If he had presented that point at the time the motion was made, appellants would have had an opportunity then to explain and possibly excuse the delay.

In support of the denial of the motion to strike, respondent invokes *Moore* v. *Re, supra,* 131 Cal.App. 557, in which the court approved the admission of evidence that the driver of a truck did not possess an operator's license, upon the ground that such evidence ''was not admitted as a proximate cause of the injury, but was proper to be considered by the jury on the general question of negligence, and also as bearing on the ability and qualifications of the driver.'' (Pp. 560-61.) The Moore case is not authority for the admission of such evidence as a proximate cause of the injury. Here, in the absence of a limitation, it was admitted for all purposes.

The Moore case has been criticized in later decisions, though not expressly overruled, for allowing such evidence on the issue of negligent operation of a vehicle. That ruling was predicated upon the fact that an operator's license was no longer issued merely for identification purposes but was based upon an examination of the applicant to test his knowledge of traffic regulations and his ability to operate and control a motor vehicle. Our study of the licensing features of the Vehicle Code leads us to a different conclusion concerning

the evidentiary value, in a negligence case, of the possession or nonpossession of a license.

■ The nonpossession of an operator's or chauffeur's license is not of itself proof that a person is an incompetent or a careless driver. He may be exceedingly competent and careful but may have neglected for a few days or weeks to renew his license. It expires by limitation (Veh. Code, §§ 276, 277). Or, he may be a person of whom a license is not required, such as an officer or employee of the United States when operating a government vehicle on government business (§ 251), or a nonresident who has a license issued by his home state or country or whose home state or country does not require a license, during the period permitted and under the conditions prescribed by section 252.

■ Indeed, the refusal, suspension, or revocation of a license does not necessarily token an administrative determination that the applicant or licensee is negligent or incompetent. There are quite a number of grounds other than negligence or incompetence, for such action. Among such other grounds for refusal are these: Failure of an applicant to furnish the department of motor vehicles information required, or the use by him of a false or fictitious name in an application for a license (§ 271). A license may be suspended for these reasons, among others: Willful violation, for 15 days, of one's written promise to appear in court, a promise given upon arrest for *any* violation of the Vehicle Code (§ 278); one's failure to stop after an accident or to give certain information to other persons involved in the accident (§§ 292, 308); failure to satisfy a final judgment for damages or to furnish proof of financial responsibility as prescribed by sections 410 to 418, inclusive; or failure to make certain reports or to furnish security following an accident, as prescribed by section 419. A license may be revoked for any of the reasons for which issuance of a license may be refused (§ 306). It must be revoked upon conviction of the theft or unlawful taking of a vehicle in violation of section 503 or upon conviction of any felony in the commission of which a motor vehicle is used (§ 304).

■ Nor does possession of a license necessarily mean that the department has determined that a person is competent to operate the particular type of vehicle which in fact he is operating at the time an accident occurs. When issuing either an operator's or a chauffeur's license, the department may impose restrictions suitable to the licensee's driving

ability, with respect to the ''type of, or special mechanical control devices required on, a motor vehicle which the licensee may operate or such other restrictions applicable to the licensee as the department may determine to be appropriate to assure the safe operation of a motor vehicle by the licensee'' (§ 273).

 Nothing that we have found in the statutory law indicates an intent upon the part of the Legislature to establish the possession of an operator's or chauffeur's license as a minimum standard of care in the operation of a motor vehicle or to create a presumption of negligence if one drives without such a license or to make unlicensed driving evidence of negligent operation of a vehicle. Quite to the contrary are the provisions of sections 754 and 755 of the Vehicle Code. They declare that no record of the suspension or revocation of any such license by the department of motor vehicles and no record of the conviction of any person for any violation of the Vehicle Code is admissible as evidence in any court in any civil action. The reasonable inference is that this licensing feature, while designed to promote safe driving upon the highways, is a device for the more efficient enforcement of the many and varied police regulations that govern the use of the highways.

Decisions subsequent to the Moore case tend to support the views which we have expressed. In *Strandt* v. *Cannon*, 29 Cal.App.2d 509 [85 P.2d 160], an instruction was held erroneous which told the jury that an operator's license is a certificate evidencing the fact that its holder has demonstrated competency to drive a motor vehicle '' 'and if the driver of a vehicle is unlicensed, that fact, if it is a fact, is *prima facie* evidence in the eyes of the law, that such driver is incompetent.' '' (P. 513.) The court, in the majority opinion, criticizes the doctrine of the Moore case and reviews authorities in this and other states, at pages 515 to 518 of the report. Justice Marks, in his concurring opinion, furnishes an especially cogent analysis at pages 519 to 523. We quote the following portion: ''The instruction given requires the trier of fact to infer from the fact that Layton was unlicensed, (1) that he was incompetent; (2) that from such incompetency he was negligent at the time and place of the accident; (3) that such negligence was the proximate cause of the accident. There is no rule of law that permits such piling of inference on inference nor any rule drawn from experience that would

justify it. The reasonable inferences to be drawn from the fact that a driver is unlicensed should be (1) that he has carelessly failed to apply for a license; (2) that he has carelessly permitted his license to expire from lapse of time without securing a new one; or (3) that his license has been suspended or revoked. Evidence supporting this latter inference is not admissible in a civil suit. (Sec. 754, Vehicle Code.) I cannot see how negligence and proximate cause can be predicated on any such inferences.

''If it should be assumed that the lack of an operator's license justifies the inference of the lack of competency of a driver, still the instruction should not have been given. In this kind of a case the courts are not interested in the competency or incompetency of a driver but only in his actions at the time and place of the accident. The question of his competency or incompetency is wholly immaterial to the questions at issue, namely, negligence and proximate cause. This rule has long been established in California.'' (Pp. 519-20.)

In *Hunton* v. *California Portland Cement Co.*, 50 Cal.App. 2d 684 [123 P.2d 947], the defendant claimed that the plaintiff was negligent because he permitted his son to drive his truck without a chauffeur's license (the son had an operator's license), and that the lack of such a license was evidence that the driver was negligent. The court disposed of that contention in these words: ''We believe the question is disposed of in the case of *Strandt* v. *Cannon*, 29 Cal.App.2d 509 [85 P.2d 160], where the proposition was clearly laid down that the driver's negligence is to be determined by the facts of the accident, and that the failure to have an operator's license is not evidence of the driver's incompetence or negligence, or that such negligence, if any, was the proximate cause of the accident.'' (P. 691.)

This does not mean that there can be no set of circumstances in a negligence case in which evidence of a driver's lack of a license is admissible in respect to some issue framed by the pleadings. This was recognized in the Strandt case when it distinguished *Owens* v. *Carmichael's U-Drive Autos, Inc.*, 116 Cal.App. 348 [2 P.2d 580], upon the ground that there liability was imposed upon an owner who negligently entrusted his automobile to another on the theory, as alleged in the complaint, ''that the defendant 'negligently let and hired' the automobile to a named man; that defendant 'negligently permitted' said man 'to drive and operate said auto-

mobile upon the highway'; that defendant knew that said man 'was not competent to operate' said automobile; and that said man 'was not licensed to drive any automobile upon such highway.' The court held that under the circumstances the fact that respondent corporation knew that the driver had no driver's license was sufficient to put it upon inquiry as to his competency and it was for the jury to determine under the circumstances whether respondent was negligent in permitting him to drive her car. At the time of this decision it was a violation of the law for an owner to entrust his car to an unlicensed person." (29 Cal.App.2d 509, at pp. 514-15.)

Similarly, in *Shifflette* v. *Walkup Drayage & Warehouse Co.*, 74 Cal.App.2d 903 [169 P.2d 996], such evidence was deemed proper upon the issue whether or not one of the parties had been negligent in employing a truck driver. The evidence was strictly limited to that issue. This appears from the following statement of the reviewing court, at page 908: "The court instructed the jury that the evidence to the effect that the truck driver had no license was admitted only for the purpose of consideration in connection with all other evidence of the question of whether the owner knew or was put on inquiry to know that it was entrusting the operation of its truck to one who was not a competent driver. It was also stated in the instruction that in determining whether the company was negligent and whether its negligence was a proximate cause of the injury the jury could consider what knowledge, if any, the evidence showed the owner to have concerning the lack of an operator's license." In holding that the submission of this issue of knowledge was not error, the court distinguished the Strandt and Hunton cases upon the ground that those cases did not involve the employment of an operator of a motor vehicle, as did the Shifflette case, and that the instruction given in the Shifflette case was consistent with the general principles of law set forth in the Strandt and Hunton cases because it expressly told the jury that " 'the possession or lack of an operator's license is not evidence that defendant, Charles Hameister, was or was not generally a competent driver; nor is it evidence that he was or was not negligent on the occasion in question.' '' (P. 909.)

In the instant case, there was under the pleadings no issue concerning the competency of the driver of the truck, nor the element of employment by appellants Borchers Bros. of a driver under circumstances which charged them with knowledge or notice that he might be incompetent. Respondent

suggests that such an issue was presented by the complaint in the allegation that defendants ''carelessly managed and operated a truck.'' We find in that allegation no such issue, nothing more than a charge of negligent conduct.

■ Respondent further urges that error, if any, in the denial of the motion to strike was cured by waiver when the appellants put in evidence of the experience of Bidar as a truck driver and of the facts concerning the delay in obtaining a license. We derive no such conclusion from the introduction of that evidence. The fact that they renewed their motion before tendering that evidence dispels any possible inference of an intent upon the part of appellants to withdraw their objection. Upon the denial of the renewed motion, the jury still had before it for consideration the fact that Bidar had no license at the time of the accident. The appellants were then under the practical necessity of offering such evidence as they might have concerning Bidar's experience as a driver and the delay in obtaining a license. In such a situation, their offering that evidence furnished no basis for predicating a withdrawal of their objection by waiver or estoppel, or upon any other theory.

■ We conclude that the denial of the motion to strike was in error, and that the error was prejudicial. There were a number of conflicts in the testimony, some of which we have noted. The evidence was so nearly in balance it would have furnished substantial support for a verdict for either party. We cannot say but that in the minds of the jury Bidar's lack of a license tipped the balance in respondent's favor.

■ Nor was this error cured by the instructions given the jury. Appellants requested and the court refused the following instruction: ''You are instructed that the evidence introduced in this case concerning the fact that Mr. Bidar did not have a license was not admitted as a proximate cause of the injury.'' The court gave the following instruction: ''I instruct you that the negligence of the operator of a vehicle is to be determined by the facts existing at the time of the accident. The fact that Mr. Bidar did not have a license was immaterial unless there was some causal relationship between the injuries and the failure to have a license or the violation of the statute in failing to have one.''

The instruction requested was sound as far as it went, removing the evidence of lack of a license from consideration as a proximate cause of the injury. The instruction given was correct as an abstract statement of law but not appropriate

to the issues and the facts in this case. It committed to the jury the decision whether or not there was a "causal relationship between the injuries and the failure to have a license or the violation of the statute in failing to have one." In making that decision, the jury was advised and guided only by instructions of an abstract nature concerning proximate cause, such as the instruction that "The proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. It is the efficient cause, the one that necessarily sets in operation the factors that accomplish the injury." Such instructions, even if correct as abstract propositions, may have misled the jury. More serious was the committing to the jury of the determination of the causal relationship when, as we have concluded, in law there was none under the issues and facts of this case. We cannot tell whether or not the jury based their verdict upon a determination that there was such a causal relationship. If they did, as they may have, the verdict would be without foundation in law and the judgment should be reversed. It is like the situation presented in *Moon* v. *Payne*, 97 Cal.App.2d 717 [218 P.2d 550]. The plaintiff had sustained injuries from a fire set by defendant, for the burning of rubbish, without first obtaining a permit. The trial court found for the plaintiff upon the sole ground that failure to obtain the required permit constituted an act of negligence *per se* and was the proximate cause of the injuries. The reviewing court held that the ordinance did not prohibit the burning of rubbish. It merely required a permit from the fire chief. And there was "no evidence in the record to create a causal connection between the failure of the defendant to procure a license and the injury sustained." (P. 719.) The court concluded that "while the question of probable cause is ordinarily one for the trier of fact (*Dennis* v. *Gonzales, supra* [91 Cal.App.2d 203], 207, it becomes one of law in the instant case when there is no evidence that the failure of defendant to obtain the permit was a proximate cause of the injuries sustained (*Satterlee* v. *Orange Glenn School Dist., supra* [29 Cal.2d 581], 590)." (P. 720.) So, in the instant case, the possibility that the jury may have based its verdict upon a putative causal relationship between the injuries and the failure to have a license or between the injuries and the violation of the statute in failing to have one, requires that the judgment be reversed.

Appellants claim that the trial court committed reversible error in refusing their requested instruction to the effect that the defendant, if acting with due care, had a right to assume that the plaintiff would exercise due care. The instruction which the court did give on that subject was identical to form 138 of California Jury Instructions, Civil. It was immediately followed by an instruction identical to form 138-A of the same work. We consider those instructions proper and that they adequately covered the subject matter of the instruction which appellants requested and the court refused.

The judgment is reversed. The appeal from the order denying a new trial, a nonappealable order, is dismissed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied July 5, 1951.