[Crim. No. 19849. Second Dist., Div. Five. Mar. 24, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
ISIAH SPRAGNEY, Defendant and Appellant.

## COUNSEL

G. Tom Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Douglas B. Noble, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—A three-count information charged defendant with vehicular manslaughter (count I—Pen. Code, § 192, subd. 3), driving under the influence of a dangerous drug (count II—Veh. Code, § 23108) and possession of a restricted dangerous drug (count III—Health & Saf. Code, § 11910). Four prior felony convictions were alleged. Three of these were eventually admitted by defendant. No proof as to the fourth prior was offered. Doctors Thompson, Fiske and DiNolfo were appointed by

the court to examine defendant. Defendant's motion to sever counts II and III from count I was denied.

Trial was by jury. Defendant was found not guilty on counts II and III. He was found guilty on count I, the jury determining that the offense was committed with gross negligence and leaving the matter of punishment up to the court. A motion for new trial and probation were denied. Defendant was sentenced to one year in the county jail.[1] Defendant appeals.

### FACTS

The facts concerning the accident, which resulted in the death of a 10-year-old girl, are tragic but brief. At about 8:45 a.m. on July 7, 1970, defendant speeded through a red light at the corner of Santa Barbara and Broadway in Los Angeles. He collided with a Volkswagen in which the victim was a passenger. His own car proceeded about 60 feet from the point of collision and overturned.

The balance of the relevant testimony has to do only with defendant's frame of mind, using that term in the broadest sense. After the accident defendant crawled out from his overturned car. He staggered and appeared unable to maintain his balance. He did not smell of alcohol, nor did he appear injured. He resisted arrest but not too combatively. His coordination was wild. There was no pattern to the way he used his hands. His movements were both rapid and slow. His eyes were wide open, and his pupils constricted. He had a fixed stare. His speech was slow, slurred and not understandable. He was smiling, laughing, and muttering. His responses were rambling and unintelligent. The arresting officer, who had somewhat limited expertise on the subject, formed the conclusion that defendant was under the influence of drugs. He had never, however, observed the same symptoms that appellant exhibited. He had no opinion concerning the type of drug involved.

The car which defendant had been driving was searched. Eight pills, four of which were later analyzed as barbiturates, were found. The car was not registered in defendant's name.

At the station a Breathalyzer test revealed the absence of blood alcohol. Defendant was then taken to the Central Receiving Hospital where he was seen by a Doctor Sanderson. A blood sample was taken. It later proved negative for alcohol or barbiturates. The blood was not tested for stimulants. At the hospital defendant continued to be restless. Instead of walking

---

[1]Credit for time served was ordered. According to the court's computations, the sentence amounted to about 166 days in jail, less good time earned.

through doors he walked into their jambs. His balance was, however, improving, as was his orientation. He became able to communicate.

In the opinion of Doctor Sanderson defendant was "completely out of touch with reality but he was awake . . . he had what we would call an acute psychosis, which is often times due to drug ingestion." He had no opinion concerning the nature of the drug. Defendant was disoriented as to time and place. "Just completely out of touch with reality." No injuries were found. Defendant's blood pressure and pulse were elevated. Whatever drugs defendant had taken they were not barbiturates. The best the doctor could say was that defendant was in an acute psychotic state, probably due to a stimulant type of drug, but he could not say with certainty.

During Doctor Sanderson's cross-examination he admitted that his impression of a drug intoxication was tentative only and that he had worked with little time to spare. Several tests which would confirm or refute his tentative diagnosis were not performed.

On redirect examination Doctor Sanderson expressed the opinion that defendant was not suffering from epilepsy because he observed no physical signs indicative of seizures and had no information that defendant had been in a comatose state after the accident. On recross the doctor admitted, in effect, that it was only grand mal epilepsy which, in his opinion, was not present. He admitted that petit mal epilepsy manifested itself only in brief periods of disorientation. There was also temporal lobe epilepsy, which sometimes resulted in psychomotor disorders. When under that type of seizure a person would appear to be awake, although he was out of touch with reality. In his view such a person was conscious.

Just before it rested, the prosecution introduced, over objection, a letter from the Department of Motor Vehicles to the effect that a thorough search of its records did not reveal that defendant had ever had a license to operate a vehicle on a California highway.

The first important defense witness was Doctor George N. Thompson. He had performed two electroenchephalograms on defendant about three and one-half months after the accident. One of them proved something wrong with defendant's right frontal brain lobe. The abnormality was consistent with either grand mal or psychomotor epilepsy. The latter results in seizures in which a person acts like a robot out of touch with reality. He appears conscious but, in fact, is not. He may appear to be going through an acute psychosis. This type of seizure is not recognizable by most doctors, except neurologists. During a seizure a person is unconscious in

the sense that he is unaware of his surroundings, although to the unknowing he would give the impression of being conscious.

Doctor Fiske, a medical psychologist, performed a battery of tests on defendant, whose IQ was found to be 76; this places him on the borderline of the mentally defective group. The tests revealed evidence of organic brain damage. If defendant had epilepsy at the time the tests were administered and had known of it, he would not have been able to conceal his knowledge.

Doctor DiNolfo, a psychiatrist, had examined defendant on October 2, 1970. In his opinion defendant suffered from frontal lobe epilepsy which causes seizures in which the person acts like a robot. During the seizures the patient is unconscious. During the psychiatric examination defendant told the doctor about an episode which happened three weeks before July 7, 1970. On that occasion defendant had been driving and had become aware that the traffic lights at an intersection ahead were red. He had noticed a police car approaching the intersection from the opposite side. In spite of this fact he had been unable to control his reactions, had run the red light and was stopped by the police. Defendant did not know why he reacted in this fashion. Defendant told the doctor about several other episodes in his past which were "epileptic equivalent states." The doctor did not believe that defendant knew that he was an epileptic or even knew what epilepsy was. Neither did defendant know that he should not be driving a car. In the doctor's view of the events of July 7, 1970, defendant was conscious when he got into the car and lost consciousness sometime thereafter. Typically when a seizure occurs while the epileptic is driving, he starts speeding up and acts as if he were glued to the wheel; he will go right through an intersection no matter what is going on. The possibility that the seizure occurred after the accident was so minimal that it could be discarded.

### Discussion

On appeal defendant raises various issues. In view of the conclusion we have reached the only ones we need mention are two: alleged insufficiency of the evidence to support the conviction and the court's claimed error in admitting evidence that defendant was not licensed to drive an automobile in California.

With respect to insufficiency of the evidence, suffice it to say, the point is at least extremely close. Unquestionably unconsciousness was a defense to the charge. (*People* v. *Freeman,* 61 Cal.App.2d 110, 117-118 [141 P.2d 435]; Pen. Code, § 26, subd. 5.) The jury was instructed to

that effect.[2] The medical evidence, presented by three doctors chosen and appointed by the court, was arguably conclusive on the point. The prosecution's initial theory that defendant was driving under the influence of a drug was pretty well destroyed by the medical evidence. Both Sergeant Stanley and Doctor Sanderson had merely formed snap judgments with respect to drug intoxication. (*People* v. *Bassett,* 69 Cal.2d 122, 137-140 [70 Cal.Rptr. 193, 443 P.2d 777].) No evidence of driving under the influence of a drug, other than their testimony was presented. About the only rationale justifying the verdict is that after the earlier episode related to Doctor DiNolfo, defendant should have had enough sense to realize that there was something wrong with him and never started the trip in the first place.[3]

 Against this factual background the court's error, if any, in admitting evidence from which it could be concluded that defendant was not legally permitted to operate an automobile in California, assumes major importance.

If this case had been a wrongful death action, there would be no doubt that the evidence of defendant's lack of a license would have been inadmissible: "The applicable rule is succinctly stated in *Strandt* v. *Cannon,* 29 Cal.App.2d 509, 518 [85 P.2d 160]: 'The weight of authority, as we see it, is that the operator's negligence is to be determined by the facts existing at the time of the accident, and whether the operator had a license to operate an automobile under the laws of this state is immaterial unless there is some causal relationship between the injuries and the failure to have a license or the violation of the statute in failing to have one.' This language was quoted with apparent approval in *Armenta* v. *Churchill,* 42 Cal.2d 448, 458 [267 P.2d 303]. To the same effect are, *Page* v. *Mayors,* 191 Cal. 263, 264 [216 P. 31]; *Wysock* v. *Borchers Bros.,* 104 Cal.App.2d 571, 582-586 [232 P.2d 531, 29 A.L.R.2d 948]; *Corsetto* v. *Pacific Electric Ry.,* 136 Cal.App.2d 631, 635 [289 P.2d 116]; *People* v. *J. P. Loubet Co.,* 147 Cal.App.2d 566, 570 [305 P.2d 651]; 7 Cal.Jur.2d § 393, p. 305." (*Crosby* v. *Martinez,* 159 Cal.App.2d 534, 542-543 [324 P.2d 26].)

The People concede that there is no reason why the general rule of inadmissibility should not apply in a criminal proceeding in which negligence

---

[2]We need not decide whether the standard instructions given on that point, CALJIC Nos. 4.30 and 4.31, adequately cover the defense of unconsciousness where there is substantial evidence of psychomotor epilepsy which produces seizures while, medically speaking, the patient is unconscious although he appears to be conscious. (See *People* v. *Williams,* 22 Cal.App.3d 34, 54-57 [99 Cal.Rptr. 103].)

[3]The trial court was apparently satisfied that defendant was, indeed, an epileptic. At the time it sentenced him it strongly urged him to continue to take medication.

is an essential part of the People's case. Indeed the opinion of the Supreme Court in *People* v. *Costa,* 40 Cal.2d 160, 167 [252 P.2d 1], appears to so assume.

■ The People do however suggest that perhaps the prosecution was "attempting to show a causal relationship—namely, the possibility that appellant was barred from having a license due to a known epileptic condition, thus placing him on notice of the danger in his driving."

Assuming, at least for the sake of argument, that a refusal to issue a driver's license to defendant based upon the reason that he had epilepsy (Veh. Code, § 12805, subd. (d)), whether such reason was communicated to defendant or not, might be a legal cause of an accident which would not have occurred but for an epileptic attack, the evidence falls far short of proof of such a refusal. It was simply to the effect that defendant had never been licensed to drive in California. This might have been due to any number of reasons. Some, for example, residence in another state (Veh. Code, §§ 12502-12503) or very recent residence in this state (Veh. Code, § 12505) would even have been perfectly legal excuses for driving without a California license.

Under the circumstances we cannot help holding that the error was prejudicial. To a lay jury, the heartbreaking circumstances of the case—an innocent young girl had been senselessly killed—surely were a powerful, if subliminal, motive for finding a culprit. Yet, as indicated, the only legal basis for a finding of fault on the part of defendant was the weak inference that he was, or should have been aware of medical reasons why he ought not to drive an automobile. Add to this the many legally irrelevant inferences which a jury may draw from the fact that the State of California had never licensed defendant to drive, and it becomes obvious that it would have no trouble at all finding the defendant was grossly negligent, without really giving much thought to the question of actual culpability.[4]

The judgment is reversed.

Stephens, J., and Aiso, J., concurred.

---

[4]The misleading naure of the evidence is even more serious than we have revealed. The communication from the Department of Motor Vehicles also includes information that defendant's privilege to drive in California had been suspended effective October 6, 1970, under the authority of section 16080 of the Vehicle Code. No one ever explained to the jury that a section 16080 suspension is provoked by a driver's failure to post security after an accident. While we must assume that the jury was aware that the suspension followed rather than preceded the fatal accident involved here, it was free to speculate that its cause was some kind of departmental determination that defendant had been at fault.