[Civ. No. 11860. Second Appellate District, Division One.—November 17, 1939.]

JOSEPHINE VALDEZ, Appellant, v. JAMES F. PERCY et al., Respondents.

David C. Marcus for Appellant.

W. I. Gilbert for Respondents.

WHITE, J.—This is an action to recover damages for the alleged malpractice on the part of defendants in so carelessly and negligently rendering surgical and medical treatment to plaintiff as to cause her to suffer the loss of her right breast, including the mammary gland, the pectoral muscles of the right side and all the lymphatic glands of the axilla up to and within the clavicle bone of her body, from all of which it was alleged plaintiff suffered serious painful wounds and bodily disfigurement. These allegations were denied by defendants. The case went to trial before a jury, resulting in the granting of a nonsuit as to the defendant Dr. Levi as to all three counts of the complaint; the granting of a nonsuit as to all other defendants on counts 1 and 2; directing a verdict in favor of defendants Drs. Hankins and Percy on count 3, and granting a nonsuit as to defendants Drs. Evans and Kimball on count 3. Plaintiff appeals.

Plaintiff's complaint originally joined the defendants Dr. James F. Percy and Dr. F. D. Hankins with the county of Los Angeles and several fictitious persons, while the defendants Drs. Theodore S. Kimball, Newton Evans and Leo M. Levi were served as fictitious defendants and filed answers. At the inception of the trial plaintiff dismissed the action against the county of Los Angeles and all other defendants, named and fictitious, except as to those above mentioned.

In the interest of clarity, the narration of the factual background surrounding this litigation might best be divided into three parts: (1) a statement of the preoperative history; (2) the operation proper, and (3) the postoperative diagnosis. This is deemed expedient because the conduct of defendant doctors Percy and Hankins pertains to the operation proper, while the conduct of defendant Drs. Kimball, Evans and Levi pertains to the pathological and microscopic examination of the specimens removed from plaintiff's body during the operation.

It is not denied that the record is barren of any testimony concerning the activities of defendant Dr. Levi in connection with plaintiff's case which showed any causal connection between anything he did and plaintiff's injuries. The evidence disclosing no connection on his part with the case, it follows that the granting of the nonsuit as to him was proper and the judgment predicated thereon must be affirmed. There was no prejudicial error in the rulings of the trial court upon questions propounded to Dr. Levi and to which objections were sustained.

Viewing the evidence in the light most favorable to plaintiff, as we are required to do in passing upon the validity of the orders granting nonsuits and directed verdicts, the record discloses that the plaintiff's husband, who was also a physician, met defendant Dr. Percy at the general hospital in 1933 where plaintiff's husband had gone to see operations and to become familiar with practice therein. During the last days of 1933 and the early part of 1934, plaintiff's husband advised Dr. Percy that the former's wife had an enlarged gland in the right axilla and desired to consult with Dr. Percy. About two weeks later Dr. Valdez brought his wife, the plaintiff herein, to the general hospital for consultation with Dr. Percy, who at that time examined Mrs. Valdez' right and left axilla, the right and left breast, and

right and left side of the neck, stating that he found an enlarged gland the size of a small egg in the right axilla, and that ·this lump should be examined to determine the nature· of the tumor. Plaintiff entered the hospital February 27 and was operated on there on March 1, 1934. The record further indicates that upon advising the removal of the gland Dr. Percy stated that upon its removal it would have to be sent to the laboratory before its character could be determined, but before that was done the case would have to be referred to what is known as the malignancy board at the general hospital. This board consists of eight or nine physicians, to whom cases are referred when there is suspicion of malignancy or carcinoma, commonly known as cancer, for the purpose, as explained by Dr. Percy, of ''getting their consensus of opinion as to what should be done''. In the instant case the malignancy board, under date of January 31, 1934, upon examination of plaintiff and consideration of her ailment, made a recommendation which we can best epitomize in the following testimony given by defendant Dr. Percy: ''The record shows itself that there was a doubt in the minds of the members of the malignancy board as to the character of that growth, and as a result of that they recommended that she have a biopsy. Q. (By Mr. Gilbert) Don't use big words, break that up so we can understand it. A. Excuse me. Cut the tumor out and send it to the laboratory. Q. (By Mr. Marcus) That was all that was recommended? A. That was all that was recommended at that time. Well, I think it says more than that. The instructions usually are that if it is malignant to go on with the radical operation. Q. Radical operation means to remove the breast? A. Yes, sir.''

While there is a conflict in the record as to what transpired on the occasion of the operation we find substantial evidence to the effect that defendant Dr. Percy, assisted by defendant Dr. Hankins, removed the gland in question, using Dr. Percy's system known as the ''Percy cautery'', which consists of a knife heated to from 1200 to 1500 degrees Fahrenheit, the heat of which is intended to destroy cancer cells with which it comes in contact. After Dr. Percy, assisted by Dr. Hankins, removed the gland, the specimen thereof was sent to the laboratory for diagnosis. Five or ten minutes thereafter the report came back from the pathologist in the laboratory that the diagnosis was ''carcinoma of the breast.'' Thereupon

Drs. Percy and Hankins prepared to remove Mrs. Valdez' right breast. While in conflict, there is evidence that before any act had been done toward removing the breast except the preparatory one of incising the skin to chart the course of the knife when the incision for removal was made, a second report was received from the laboratory, after a pathological examination of the entire mass of tissue, informing the surgeons that there had been a mistake in the first diagnostic report, and that the true diagnosis was "lymphoma, possibly Hodgkins' disease". The surgeons, Percy and Hankins, then proceeded to and did remove Mrs. Valdez' right breast.

The importance of the laboratory test and the measure of guidance it furnishes the operating physician is established by the testimony of defendant Dr. Percy as follows: "Q. Well, Doctor, the diagnosis of the pathologist in the laboratory was a part of this operation, was it not? A. Absolutely. Q. And you depended upon the pathologist to tell you what the article was, did you not, that was sent there? A. What? Q. The specimen or the article or the sample that was sent to the laboratory. A. I depended on what? Q. On the pathologist to advise you what it was, did you not, Doctor? A. I think I have already stated that. Absolutely, that we had to have this removal of this gland. Q. Well, you depended upon it for that? A. Absolutely."

Appellant contends that because defendant Dr. Percy was employed to operate upon the axilla, that when he performed an operation upon another and different part of the body, to wit, the breast, he and the defendants working with him were guilty of negligence for the reason that no immediate emergency existed which required the removal of the breast; and further, that regardless of any negligence based upon the nature of their employment, defendants were guilty of negligence in removing the breast in the face of the conflicting and consequently unreliable diagnoses received from the pathological laboratory.

It might be well here to state that the evidence indicates that the difference between Hodgkins' disease as referred to in the second pathological report and carcinoma of the breast is that Hodgkins' disease affects the lymph nodes (numerous nodules composed of lymphoid tissue occurring along the course of the lymphatic vessels; see American Illustrated Medical Dictionary, 17th Edition), while carcinoma of the

breast attacks the glands of the breast; they are two different tissues entirely; but *both Hodgkins' disease and carcinoma of the breast are malignant.* The evidence also indicates that following the operation the entire breast which had been removed, as well as the axillary glands, were sent to the laboratory for postoperative diagnosis. This postoperative diagnosis did not indicate the existence of carcinoma of the breast.

█ The evidence as to whether the plaintiff authorized the defendant doctors Percy and Hankins to remove her breast was, to say the least, in conflict, and should have been submitted to the jury. Whether a condition arose and was discovered during an authorized operation for the removal of plaintiff's enlarged axilla gland under her right arm, and which condition required another operation to remove her right breast, was also one of fact, in connection with which the testimony was conflicting, and should have been determined by the triers of fact. █ It is firmly established as the law that where a person has been subjected to an operation without his consent such an operation constitutes technical assault and battery. (*Hively* v. *Higgs,* 120 Or. 588 [253 Pac. 363, 53 A. L. R. 1052].) █ Respondent contends that the doctors were clothed with authority to perform the operation upon plaintiff's breast by reason of an agreement signed by her and her husband at the time the former entered the hospital, reading in part as follows:

"The undersigned patient and others hereby consent to any and all of the medical and surgical treatments, including operations, vaccinations, and immunizations against disease, which may be deemed advisable by any of the physicians and surgeons of the Los Angeles County General Hospital, the intention hereof being to grant authority to administer and perform all and singular, any examinations, treatments, operations, diagnostic procedures, vaccinations and immunizations against disease, which may now or during the course of the patient's care as either an in-patient or an out-patient be deemed advisable or necessary. . . . "

However, we do not understand such agreement to constitute a consent to perform operations other than the one for which the operating surgeons were engaged by plaintiff to perform unless necessity therefor arose during the authorized operation as hereinbefore mentioned. And in any event, such an agreement does not absolve the operating physicians

of liability for negligence, if any existed, in the performance of such operation.

■ Upon the question of alleged negligence on the part of defendant doctors Percy and Hankins in the performance of the operation, plaintiff offered testimony in the form of hypothetical questions propounded to a physician and surgeon, objections to which were sustained on the main ground that no proper foundation was laid and the witness was not qualified to answer the interrogatories. These rulings of the trial court are here assigned as error. The expert witness in question testified that he was a licensed physician, graduated from a recognized school of medicine in 1928; specialized in pathology in cancer; worked in pathological laboratories for twelve years; spent two years at the Mayo Clinic in Rochester; was affiliated with the Soiland Clinic at Los Angeles from 1931 to 1937; that he was assistant director of the public health laboratory at the University of North Dakota in 1928 and 1929; that he had treated many cancer cases; that in his experience with pathology in cancer he had examined the tissue in some three to four thousand cases.

■ Conceding that the qualifications of a witness to testify as an expert are matters within the sound discretion of the trial court and that its ruling will not be disturbed on appeal unless a manifest abuse of that discretion is shown (*Darling* v. *Pacific Elec. Ry. Co.*, 197 Cal. 702, 714, 715 [242 Pac. 703]), nevertheless the determinative test as to whether the trial court properly exercised its discretion is whether the witness disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury. The training, experience and practice of this doctor certainly qualified him as possessing knowledge of the care and treatment usually and ordinarily employed by skilled physicians and surgeons in good standing practicing in the locality of Los Angeles in the treatment of cancer. ■ We cannot agree with respondents that this witness affirmatively disqualified himself because in his experience he had never ''had this character of a situation presented to him in any way, shape or form before'', or in other words, that he was disqualified from testifying as an expert because in his experience he had never been confronted with two laboratory reports the second of which advised that the first was incorrect. The very object of the hypothetical question was to show by this witness that

when defendant doctors Percy and Hankins proceeded with the removal of plaintiff's breast notwithstanding conflicting reports from the pathologist, they did not exhibit that skill usually and ordinarily employed by physicians and surgeons in the locality in question. To adopt respondent's theory would be to say that a physician was immune from expert testimony in criticism of his methods so long as he adopted operative methods never employed by any other physician in the performance of an operation for the cure of the particular malady in question; this because the practitioner, knowing that no such person could be found to testify against him with regard to such negligence, the injured person would thereby be without remedy. This cannot be the law. Although this witness testified that he had discussed the "Percy cautery" operative method originated by defendant Dr. Percy, it was not a necessary prerequisite to his qualifications to testify as an expert that he be familiar with the so-called "Percy cautery" method. (*Kershaw* v. *Tilbury*, 214 Cal. 679, 692 [8 Pac. (2d) 109].) Respondents' objections might affect the weight to be given the expert testimony of the witness, but they cannot avail to disqualify him from testifying.

Although several hypothetical questions were propounded, some of which were vulnerable to objection, we have no hesitancy in saying that the hypothetical question finally propounded (and for the guidance of court and counsel on a retrial we may say that the same appears on pages 658, 659, 660 and 661 of the reporter's transcript) satisfies the test set forth in *Hutter* v. *Hommel*, 213 Cal. 677, 680 [3 Pac. (2d) 554], and the court should have permitted the same to be answered. Had this testimony been admitted, as it should have been, the evidence would then be in conflict as to the alleged negligence of the operating physicians. It is elementary that when the evidence is in conflict the granting of a motion for a directed verdict is error.

As heretofore stated, the claimed negligence of Doctors Kimball and Evans is dependant upon their conduct and actions as pathologists working in the laboratory of the general hospital. Neither was present at or participated in the operation upon plaintiff. Dr. Kimball received the specimens through the regular hospital routine and made the examinations thereof, while Dr. Evans was the director in

charge of the laboratory at the hospital. From the evidence it appears that when the first section of the specimen was presented to Dr. Kimball his report was that if the specimen was from the breast of the patient it might be carcinoma of the breast; that he later called for the large piece of tissue from which the previously examined section had been prepared, and it was transmitted to him at the laboratory. When the large specimen was presented to Dr. Kimball an examination disclosed to him that it was not breast tissue, whereupon he sent a message to the surgery department of the hospital to the effect that the tissue originally received not being breast tissue his diagnosis on the first section submitted to him could not be depended upon so far as any breast malignancy was concerned. There is no evidence that Dr. Kimball was aware that an axilla tumor was being removed from the plaintiff. In fact, it would appear from a reading of the testimony that he did not know what operation was taking place or that any operation was in progress. The record is barren of any testimony warranting either an inference or a conclusion that Dr. Kimball either lacked skill or that he was negligent. The action of the trial court in granting a nonsuit in favor of the defendants Doctors Kimball and Evans as to all three counts of the complaint was therefore proper.

What we have herein said renders unnecessary discussion of other points raised by appellant, as the errors complained of are not likely to occur upon a retrial.

For the foregoing reasons, the judgment is affirmed as to defendants Newton Evans, Leo M. Levi, and N. S. Kimball; and as to defendants James F. Percy and F. D. Hankins the judgment is reversed and the cause remanded for a new trial as to such last-named defendants.

York, P. J., and Doran, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 11, 1939, and an application by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 11, 1940.