[L. A. No. 22536.   In Bank.   Mar. 17, 1953.]

GEORGE FARBER, an Incompetent Person, etc., Appellant,
v. DAVID M. OLKON et al., Respondents.

Fred Girard and Joseph D. Flaum for Appellant.

Reed & Kirtland, David Sosson, Henry E. Kappler and Fred O. Reed for Respondents.

SCHAUER, J.—Plaintiff, a mentally ill person appearing by guardian *ad litem,* appeals from an adverse judgment entered upon a directed verdict in his action to recover damages from defendants for alleged bodily assault and negligence in administering an electroshock treatment to plaintiff. We have concluded that, contrary to plaintiff's contention, the trial court's determination that he was not entitled to the benefit of the doctrine of res ipsa loquitur was

correct and that, although the evidence be viewed in the light most favorable to plaintiff and conflicts disregarded (see *Huffman* v. *Lindquist* (1951), 37 Cal.2d 465, 468-469 [234 P.2d 34]; *Lashley* v. *Koerber* (1945), 26 Cal.2d 83, 84-85 [156 P.2d 441]), defendants' motion for directed verdict was properly granted. It follows that the judgment should be affirmed.

Plaintiff was 31 years of age at the time of the treatment of which he here complains. He became mentally ill in August, 1936, at the age of 19, and since then has continued to suffer from chronic schizophrenia with hebephrenic and paranoid features with progressive mental deterioration. After being cared for at his father's direction in various homes and sanitariums he was, in 1944, committed to Camarillo State Hospital, hereinafter termed Camarillo, which is under the supervision of the Department of Mental Hygiene[1] (Welf. & Inst. Code, § 154), hereinafter termed the Department. He remained at Camarillo until August 8, 1947, when he was paroled to, and by Camarillo transported to, Los Angeles Neurological Institute,[2] hereinafter termed the Institute, under the father's agreement that he would care for and maintain plaintiff and, upon request, cause plaintiff's return to Camarillo at the father's own expense. Three days later, August 11, 1947, the father, with permission of the Institute, took plaintiff for an automobile ride, but failed to return plaintiff thereto until August 29, 1948. In the meantime plaintiff had been kept for various periods at the father's home, in a sanitarium and in a hospital. At the hospital a brain operation known as a lobotomy was performed by Dr. Seletz on June 27, 1948, with the father's consent. (This lobotomy is mentioned here only as a relevant incident in plaintiff's medical history.)

The history given by Dr. Seletz states that the patient "has stereotyped behavior—will not answer questions. He has no discipline and continues to ramble in his speech . . .

[1] Also known as the Department of Institutions (Welf. & Inst. Code, § 151.5).

[2] Los Angeles Neurological Institute is the name under which the defendant Olkon-Wayne, Inc., a corporation, is alleged to have conducted its business, and David M. Olkon and George J. Wayne are alleged to have been employes of the corporation. Dr. Wayne testified that both Dr. Olkon and he were directors of the corporation and of the Institute. Other persons named as defendants participated as nurses in giving the treatment alleged to have been negligently administered.

his thoughts are disjointed. . . . He refuses to use water to wash with since he states it is too costly. He will not bathe, and will not use the toilet. . . . He has had some 80 shock therapy treatments, both in private hospitals and at Camarillo State Hospital. . . .'' Following the lobotomy plaintiff was cared for in his father's home, but his condition gradually deteriorated, and he became more readily upset and disturbed. After consulting with Dr. Seletz, who suggested that following a lobotomy ''sometimes they gave shock treatments,'' the father returned plaintiff to the Institute on the evening of August 29, 1948, and at that time discussed with defendant Dr. Wayne, who is one of the directors of the Institute, plaintiff's agitated and confused behavior and Dr. Seletz' suggestion of shock treatment, and ''asked Dr. Wayne to see what he could do to help the boy.'' The father also signed a written consent to administration of the electric shock therapy.

Dr. Wayne, a licensed physician and surgeon who has specialized in psychiatry since 1940, had examined plaintiff when the latter had been admitted to the Institute in 1947 and was aware of his condition and the history of his treatment since then, including the lobotomy. Following further examination of plaintiff Dr. Wayne diagnosed his condition as the same as before, except worse, and on August 30, 1948, administered a shock treatment to him. Dr. Wayne testified that immediately after that treatment ''there seemed to be evidence of a favorable response, and ordinarily we have found it good practice to skip a day in between each treatment . . . to observe the reaction to the individual treatment. . . .'' Pursuant to this practice a second treatment was given to plaintiff on September 1, but between five and ten seconds after the current was applied and while plaintiff was in a convulsive state a snapping or ''crunching'' sound was heard by Dr. Wayne and the attending nurses. Dr. Wayne, suspecting fractures of the patient's bones, ordered X rays, and it was discovered that both femur bones had broken close to the heads. Plaintiff was thereupon taken to Temple Hospital for treatment of the fractures, and was kept in hospitals and at his father's home until March, 1949, when at the request of the Department the father returned him to Camarillo. Following the fractures, plaintiff's hips have become permanently deformed.

As grounds for reversal, plaintiff contends that as he was an incompetent without understanding and at the time of

the shock treatment here involved had no court appointed guardian, the treatment was administered without any authorized consent thereto on plaintiff's behalf and therefore as a matter of law constituted an assault. Plaintiff further contends that the case should have gone to the jury on the issue of negligence, both under the doctrine of res ipsa loquitur and because the evidence allegedly would support a finding that defendants negligently failed to properly and adequately restrain plaintiff's body when the treatment was given.

Some 450 patients are paroled from Camarillo each month. In 1947 plaintiff's father requested that plaintiff be paroled. The request for parole was taken up at a meeting of the hospital's staff of physicians in April, 1947, and after considering the plaintiff's "hopeless mental condition" and unfortunate personal habits an "indefinite parole direct to licensed mental sanitarium" was recommended. The father upon being informed that "I should find a licensed place," made arrangements for plaintiff to be cared for at the Institute, which is a mental hospital licensed under section 5700 et sequitur, of the Welfare and Institutions Code and under division XI[3] of the rules and regulations of the Department (which were introduced into evidence). The father also signed the customary parole agreement or "bond" with the Medical Superintendent of Camarillo, which provides that the father "does hereby accept custody of said patient, with the understanding that he will continue under the jurisdiction of the Division of Extramural Care of the State Department of Institutions. It is further agreed to care for and maintain him and to see that he is promptly returned to the Hospital without any expense to the State in the event return is found necessary or advisable, or is recommended by the Division of Extramural Care." Plaintiff was thereupon, on August 8, 1947, "paroled to Los Angeles Neurological Institute" for an indefinite period and was taken to the Institute, as related hereinabove.

An officer of Camarillo testified that at the time plaintiff was paroled it was customary for parolees "to be furnished medical care by either a State licensed institution or the person to whom they were paroled," and that the Depart-

[3]This division deals with the establishing, licensing, inspecting, management, conduct, and personnel of private institutions for the care of insane and incompetent persons.

ment "looked to the person to whom the patient was paroled to furnish the custodial care and also the medical care as they might require . . ."; that plaintiff "was paroled to the Los Angeles Neurological Institute and to no one else," and that both the Institute and the father had the responsibility to see that plaintiff had such medical care and maintenance as he might require. The witness further stated that the Department knew that the Institute was "a licensed mental hospital at the time. . . . And . . . a place where medical and psychiatric care could be furnished," and affirmed that as specified by rule 10 of division XI of the Department's rules and regulations "All patients who are confined or reside in [licensed, private] institutions, except those whose religious beliefs are in opposition to the receiving of medical attention, must be supervised and visited by a regularly licensed physician, and treatment must be outlined and shown in the records";[4] that from the time plaintiff was paroled to the Institute in August, 1947, until the parole was terminated by the Department in March, 1949, there was "in accordance with the last agreement signed [by the father] at the time he [plaintiff] left [Camarillo]" no other place authorized to furnish medical care to plaintiff except the Institute.

The superintendent of Camarillo "may grant a parole or leave of absence to a patient under general conditions prescribed by the Department." (Welf. & Inst. Code, § 6726.) The conditions prescribed by the Department are found in rule 21 of division III of its rules and regulations, and include provisions that the person and the place to which the patient shall be paroled must be specified, that the Department may transfer the patient from time to time as may seem most beneficial to the patient, and that "No person shall have the authority to change the conditions of any parole without full approval of the Department." Plaintiff does not suggest that the superintendent did not exercise a proper discretion in paroling him to the Institute, nor that the 28 shock treatments which the record shows were administered to plaintiff by Camarillo were unauthorized (indeed, plaintiff concedes that the superintendent is directed

---

[4]Rule 10 also provides that "Records of the reception and care of patients in private institutions shall be kept with details as to all incidents, restraint, physical and mental treatment. These records shall be open to inspection by the Department of Institutions or any other authorized agent."

by section 6559 of the Welfare and Institutions Code to treat the patients), but it is contended that because plaintiff was an incompetent adult rather than a minor neither his father nor the Institute could lawfully consent to or administer such treatments and, hence, that the treatment administered by Dr. Wayne and the Institute, constituted an unlawful assault and battery.

In the first place, it is apparent from the testimony of the Camarillo officer quoted hereinabove, as well as from the Department's rules and regulations, that when a patient is paroled it is contemplated and customary that he receive appropriate medical treatment in the licensed and inspected institution to which he is transferred, and that under the terms of the parole and the father's agreement here involved both the Institute and the father had the responsibility of seeing that plaintiff received necessary treatment. ▉ Moreover a father is required under the law to care for and maintain an incompetent adult child (Civ. Code, § 206; see, also, *Anderson* v. *Anderson* (1899), 124 Cal. 48, 54-55 [56 P. 630, 57 P. 81, 71 Am.St.Rep. 17]). ▉ It also appears to be the general rule that ''In case of an emergency a surgeon may operate on a [minor] child without waiting for authority from the parents . . . where it appears impracticable to secure it,'' but that in the absence of an emergency the parent of such a child may lawfully consent to the operation. (See 70 C.J.S., p. 968.) ▉ We are of the view that where an adult child is incompetent and has no legally appointed guardian the right to consent to such treatment resides in the parent who has the legal responsibility to maintain such child. ▉ Under the circumstances here shown we are persuaded that the Institute and Dr. Wayne were justified in proceeding with the treatments in reliance both upon the terms of plaintiff's parole and upon the signed consent of the father, and that plaintiff's claim that such treatments constituted an unlawful assault or battery upon his body is without foundation. Cases relied upon by plaintiff (see *Markart* v. *Zeimer* (1924), 67 Cal. App. 363, 367 [227 P. 683]; *Inderbitzen* v. *Lane Hospital* (1932), 124 Cal.App. 462, 467-468 [12 P.2d 744, 13 P.2d 905]; *Valdez* v. *Percy* (1939), 35 Cal.App.2d 485, 491 [96 P.2d 142]; *Estrada* v. *Orwitz* (1946), 75 Cal.App.2d 54 [170 P.2d 43]; *Hively* v. *Higgs* (1927), 120 Ore. 588 [253 P. 363, 53 A.L.R. 1052]; *Pratt* v. *Davis* (1906), 224 Ill.

300 [79 N.E. 562, 7 L.R.A.N.S. 609]) involve situations where treatment was given or acts performed either without any authorized consent whatsoever or which went beyond the consent given, and are not controlling here.

Section 5750 of the Welfare and Institutions Code, which prohibits the detainment in a private mental institution of an involuntary patient except upon the certificate of a doctor who has no financial interest in the institution, obviously does not apply where, as here, the patient is paroled direct to such institution by the Department of Institutions.

It further appears that the doctrine of res ipsa loquitur may not be invoked by plaintiff. That doctrine applies in medical malpractice cases only where a layman is able to say as a matter of common knowledge and observation, or from the evidence can draw an inference, that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised (see *Engelking* v. *Carlson* (1939), 13 Cal.2d 216, 221 [88 P.2d 695]), and it was in such situations that plaintiff was held entitled to the benefit of the doctrine in *Ybarra* v. *Spangard* (1944), 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258], *Dierman* v. *Providence Hospital* (1947), 31 Cal.2d 290 [188 P.2d 12], and *Cavero* v. *Franklin Gen. Benevolent Soc.* (1950), 36 Cal.2d 301 [223 P.2d 471], upon which plaintiff here relies. Thus, in the Ybarra case, plaintiff while unconscious on an operating table received injuries to a healthy part of his body, not subject to treatment or within the area covered by the operation, from instrumentalities used in the treatment; in Dierman plaintiff was injured when an explosion occurred close to her face or in her respiratory tract while the surgeon was cauterizing a nose wound with a hot electric needle; and in Cavero the infant patient died while undergoing a tonsillectomy under the influence of a gas anesthetic, and the evidence of the medical experts prima facie established that "except for infected tonsils and adenoids and a slight temperature due to such infection, the child was normal and healthy," that the death was not due to any pre-existing condition, and that death under such circumstances ordinarily does not occur when the operation is performed with due care and skill, i.e., in the absence of negligence; and, hence, it was held, in the absence of explanation by the defendant an inference of negligence could be drawn by the trier of facts.

By contrast the undisputed testimony of both defendant Dr. Wayne and the witness Dr. Thompson in the instant case established that electroshock treatment is designed to have "an effect upon the entire body. The entire body is actually thrown into a convulsive state, and the aim and hope, of course, is that this convulsion, and all of the biochemical changes that occur with this type of convulsion, will produce a helpful and beneficial effect upon the patient's mental condition"; that "the most frequent, the most usual and the most common hazard which is germane, which is inherent in the method of treatment, is fractures. There are certain other hazards, and, indeed, there are some cases in which death has actually resulted, directly from the hazard germane to the treatment, but these are the calculated risks of the treatment. . . . [F]ractures occur as the result of muscle tension, whether it is in shock treatment or from stepping off of a curb . . . and in shock treatment there is muscle tension, which is a part of the treatment, and therefore . . . fracture becomes a calculated and even an expected risk of the treatment. . . . [T]here is a certain percentage of fractures which occurs notwithstanding any kind of precaution or care that can be taken to prevent it. . . . The area of fracture is completely unpredictable. . . . [T]he overall incidence of fractures in shock treatment varies anywhere from perhaps one-half to about three and a half per cent. If one considers fractures of the spine . . . the incidence is" between 10 and 40 per cent. Dr. Wayne's "surmise . . . In retrospect" was that plaintiff's legs broke because "nutritional disturbances consequent upon long-standing mental illness affected bony structures"; the machine used in giving the treatment was a standard type, "one of the best; certainly one of the most expensive" and in good working order and "perfect condition"; when the "machine is out of order it becomes almost immediately apparent." Under such circumstances the trial court correctly concluded that the opinions of experts are required to evaluate the procedures and hazards of shock therapy in any particular case and that here neither does the expert testimony directly show (by the opinion of a competent witness to that effect) that there was any lack of due care or skill in the conduct of defendants, nor does the evidence show any combination of facts and expert opinion from which a layman can draw the inference that the consequences of the treatment administered to plaintiff were

not such as ordinarily, i.e., normally, may follow if due care has been exercised. Accordingly, no basis for invoking the doctrine of res ipsa loquitur was established. The same conclusion upon similar facts was reached by the court in *Quinley* v. *Cocke* (1946), 183 Tenn. 428 [192 S.W.2d 992].

Plaintiff's final contention—that defendants' own evidence would support a finding of negligence—is ingenious but utterly lacking in merit. The evidence relied upon is as follows: Dr. Wayne and three nurses testified at the trial that all three of such nurses assisted in restraining plaintiff during the treatment; there was no testimony that less than three nurses, or that any number of nurses other than three, participated in the treatment; there was, however, a conflict between the testimony referred to above as adduced at the trial and the testimony of Dr. Wayne and two of the nurses as originally given upon the taking of their depositions (subsequently corrected) as to the identity of one of the three participating nurses. Plaintiff argues that this original (later corrected and eliminated) conflict indicates that actually only two nurses assisted and that since Dr. Wayne thought it best to use three nurses it was negligent to use less than three. In drawing these factual inferences plaintiff strains too heavy a haul upon too thin a trace; it cannot support even an appellate court's appraisal of what could be substantial in a trial court.

Even if it were assumed that only two nurses rather than three were used in plaintiff's case, it would not appear that a reasonable standard of practice had been violated. The only evidence as to the standard of practice was supplied by defendants. It is that "the whole matter of restraint . . . is in a state of great flux," with from one to five nurses being used by various practitioners, and that "There are some who restrain legs and some who do not restrain the legs at all. . . . For example, some therapists felt that an absolute minimum of restraint was the important thing; others have felt that an absolute maximum of restraint was the important thing, and there were all gradations in between." Dr. Wayne followed a middle course as he felt that "a mild to moderate amount of manual restraint should be used." "Under the practice . . . in the case where the one nurse was used to assist the doctor . . . the upper portion . . . of the anatomy would be restrained . . ., the lower extremities were allowed to move without any restraint."

Plaintiff stresses that Dr. Wayne testified that in plaintiff's case he used three nurses because he "felt that three nurses were necessary in order to properly restrain the plaintiff." In response to the question by plaintiff's counsel, "What dangers did you apprehend that these nurses might be able to relieve against or guard against in the way of restraint?" Dr. Wayne replied, "The specific danger would be too gross movement of the legs." Dr. Wayne further stated that "in accordance with the standard of practice in 1948, that danger was common knowledge to all practitioners," with the qualification that one group of practitioners believed "that there is danger of bone breakage and injury if restraint is used on too gross movements," that another group believed "that if restraint is not used there is danger of bone breakage and muscular injury," and that a third group of practitioners, with whom Dr. Wayne agreed, stood in between; that within the standards "individual patients require different amounts of restraint" and "under the standard" preferred by Dr. Wayne he "felt that George Farber required three nurses," disposed one at the extremities and two at the shoulders of the patient, but he did not believe "that with less than three nurses there was [more] danger of bone breakage . . . and the reason for it is that I use two and three nurses just as frequently. In this particular case in question, I used three . . . I think it would have been possible to use two nurses, as I check matters before and since. In other words, a question of two or three here is not a crucial question . . ."

Furthermore, it is to be noted that all of the testimony on the subject is to the effect that two nurses were stationed at plaintiff's shoulders (one at each shoulder), and that a third nurse stood at plaintiff's feet holding his ankles. The testimony relied upon by plaintiff as constituting a conflict concerned the identity of one of the nurses standing at plaintiff's shoulders, and there is no suggestion in the record or evidence upon which an inference could be drawn by laymen that plaintiff's ankles were not under restraint during the treatment, or that the use of only one nurse instead of two at plaintiff's shoulders would have constituted a negligent contribution to the fracturing of his femurs.

Pathetic and heartrendingly grievous as is the plight of plaintiff—and his loyal father—there appears no basis whereby at law and in justice the defendants sued herein can be held to have violated a duty or to be accountable to

plaintiff in damages. The fact that what was done with due care to help resulted instead in further hurt sets up no cause of action in tort.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

I cannot agree with the majority that the doctrine of res ipsa loquitur may not be invoked by the plaintiff in this appalling case. If ever a situation existed where it was more applicable it has not been called to my attention. We have here a patient, mentally deficient, undergoing shock treatments to relieve that mental condition, emerging with both femur bones broken and a resulting permanent physical deformity.

In *Ybarra* v. *Spangard*, 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258], this court said: "The doctrine of res ipsa loquitur has three conditions: '(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.' (Prosser, Torts, p. 295.) It is applied in a wide variety of situations, including cases of medical or dental treatment and hospital care. (*Ales* v. *Ryan*, 8 Cal.2d 82 [64 P.2d 409]; *Brown* v. *Shortlidge*, 98 Cal.App. 352 [277 P. 134]; *Moore* v. *Steen*, 102 Cal.App. 723 [283 P. 833]; *Armstrong* v. *Wallace*, 8 Cal. App.2d 429 [47 P.2d 740]; *Meyer* v. *McNutt Hospital*, 173 Cal. 156 [159 P. 436]; *Vergeldt* v. *Hartzell*, 1 F.2d 633; *Maki* v. *Murray Hospital*, 91 Mont. 251 [7 P.2d 228]; *Whetstine* v. *Moravec*, 228 Iowa 352 [291 N.W. 425]; see Shain, *Res Ipsa Loquitur*, 17 So.Cal.L.Rev. 187, 196.)

"There is, however, some uncertainty as to the extent to which res ipsa loquitur may be invoked in cases of injury from medical treatment. This is in part due to the tendency, in some decisions, to lay undue emphasis on the limitations of the doctrine, and to give too little attention to its basic underlying purpose. The result has been that a simple, understandable rule of circumstantial evidence, *with a sound background of common sense and human experience, has occasionally been transformed into a rigid legal formula, which arbitrarily precludes its application in many*

*cases where it is most important that it should be applied. If the doctrine is to continue to serve a useful purpose, we should not forget that 'the particular force and justice of the rule, regarded as a presumption throwing upon the party charged the duty of producing evidence, consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to him but inaccessible to the injured person.'* (9 Wigmore, Evidence [3d ed.], § 2509, p. 382. . . ." (Emphasis added.)

In the Ybarra case, the plaintiff was to have an appendectomy. He emerged from the anesthetic with an injured shoulder from which he developed a paralysis and atrophy of the muscles surrounding it. This case the majority seeks to distinguish on the ground that he received injury to a healthy part of his body not within the area to be covered by the operation. Does not that same fact prevail here? Plaintiff was to be treated for a mental condition and emerged with fractured femurs.

To say that the doctrine was applicable and an instruction thereon should have been given, is not to say that every time the doctrine is invoked, the person relying thereon is entitled to recover damages. All that the law requires is, that the defendant charged with negligence rebut the inference of negligence by giving a reasonable explanation of the cause of the injury. This is as it should be in a situation where the instrumentality causing the injury is within the exclusive control of the defendant, or his agents, and particularly so where, as here, a plaintiff was unconscious and, even had he not been mentally incompetent, completely unable to testify as to what occurred. As was said in the Ybarra case "the particular force and justice of the rule . . . consists in the circumstance that the chief evidence of the true cause, *whether culpable or innocent,* is practically accessible to him [the defendant] but inaccessible to the injured person." (Emphasis added.)

With respect to the confusion as to whether there had been two or three nurses holding plaintiff on the table during the shock treatment, I cannot refrain from noting with amusement, a quotation from the testimony of defendant, Dr. Wayne. He is reported as saying, in part, "I think it would have been possible to use two nurses, as I check matters before and since. *In other words, a question of two or three here is not a crucial question. . . .*" (Emphasis added.)

Since when has it been necessary for a defendant to point out to a court and jury what is a crucial question in a case?

I am also amused at the statement in the majority opinion that "Pathetic and heartrendingly grievous as is the plight of plaintiff—and his loyal father—there appears no basis whereby at law and in justice the defendants sued herein can be held to have violated a duty or to be accountable to plaintiff in damages." As I have heretofore pointed out, invocation of the doctrine of res ipsa loquitur in a case such as this is not only proper, but the fair, just and equitable thing to do. And, had the doctrine been invoked, and an instruction given thereon, the heartbroken majority of this court would merely have been declaring the law, not transgressing it.

I would reverse the judgment in the hope that justice might be done on a retrial of the cause.