Lucille MOORE, Plaintiff-Respondent,

v.

G. Farrell WEBB, DDS, and Frank E. Klee, DDS, Defendants-Appellants.

No. 23270.

Kansas City Court of Appeals.

Missouri.

April 3, 1961.

Roy F. Carter, Kansas City, for appellant.

Phillip L. Waisblum, Robert B. Paden, Kansas City, for respondents.

CROSS, Judge.

In this malpractice suit plaintiff Lucille Moore asks damages from defendants G. Farrell Webb and Frank E. Klee, dentists in partnership, caused by their extraction of eight of her teeth without her consent while she was in a state of anaesthesia. The trial resulted in a jury verdict and judgment for $5,500 in favor of plaintiff. Defendants have appealed.

Defendants first contend that plaintiff failed to make a submissible case and that the trial court should have directed a defendants' verdict. It is argued there is no evidence to show: (1) that plaintiff's eight teeth were extracted without her consent; (2) that she did not intend their extraction; (3) that defendants were not apprised that she didn't intend the extractions; and (4) that the teeth did not need to be removed.

In determining the sufficiency of the evidence to make a case we assume as true every fact and circumstance in plaintiff's favor and resolve all reasonable inferences favorably to her. All evidence and inferences unfavorable to plaintiff we shall disregard.

There is evidence in the record to establish the following facts: Plaintiff is 43 years old, married, and the mother of five children. On November 29, 1957, she consulted Dr. George Martin, a dentist, because an upper tooth was cracked and another one had a loose filling. In past years she had lost several back teeth, some from the effects of childbearing. She had six upper teeth and ten lower teeth, all in front and adjoining, none causing any trouble. Dr. Martin "very carefully" examined her teeth and recommended that the six upper teeth be extracted and replaced by a com·

plete upper denture. He advised extraction of two lower teeth, second bicuspids, and the use of a partial lower denture with the remaining eight teeth. Plaintiff agreed to that plan and "understood that Dr. Martin would make her a complete upper denture and a lower partial one to be placed in back of the eight lower teeth that were to be left intact". Dr. Martin gave plaintiff a written quotation on the cost of the dentures. He referred plaintiff to Doctors Webb and Klee for the extraction work, and prepared a "referral card" on which he wrote "Remove all uppers and both lower 2nd bicuspids".

By appointment plaintiff went to defendants' office and handed her card to the receptionist. After her teeth were X-rayed she was taken to "a little place where they drape you and lay you back". A nurse appeared and plaintiff was given a "shot", after which she felt herself "going out". She then inquired: "Don't I even get to see the dentist going to do the work?" Dr. Webb appeared, briefly, but she was "getting woozy". They talked only about a recent bereavement of her brother-in-law, who was a friend of Dr. Webb, as "that is all the time we had". She was then going to sleep. There was no discussion about her teeth. She stated: "If we had talked, I might have talked that over".

Next, one of the girls in the office came in, put a thermometer in plaintiff's mouth, and asked her to sign a paper, stating that it was "a formality for the doctor to do her work". Plaintiff testified "I couldn't see. I could see lines, but I couldn't read a bit and she held it up and I signed it, and I don't even remember doing that, and the next thing I knew was when I woke up and I discovered my mouth was empty. I just went hysterical".

The reverse side of the "paper" contained words, figures and marks which defendants term a "chart" to indicate the teeth that had been marked for extraction. That side of the document was not shown to plaintiff at any time. The X-rays of her teeth were never shown to her. Neither dentist or any technician ever talked to plaintiff about the X-rays or about which of her teeth were to be extracted. According to the testimony of defendants' dental assistant, who was present during the extraction operation, both defendants participated in removing plaintiff's teeth, Dr. Webb being the first actor. He came into the surgery room, marked the chart for the teeth to be removed, and administered plaintiff sodium pentothal, a general anaesthetic. Then he called in Dr. Klee, turned the job over to him, and left the surgery room. Dr. Klee extracted all of plaintiff's upper teeth and proceeded to take out the lower ones. After removing one or two of the lower teeth, Dr. Klee stopped and said, out loud, "Are these teeth to be removed?" He turned and looked at the chart and said, "Well, they are marked". He resumed the "surgery" and pulled all of the teeth remaining in plaintiff's mouth.

When plaintiff regained consciousness in the recovery room, she became very distressed because all her teeth were gone, and was crying as hard as she could. She opened her mouth for her daughter to see and said, "He pulled all my teeth." While she was still "crying and upset and such" she told defendants' assistant that all of her teeth were gone and that she wasn't supposed to have all of them out—that she didn't want all of them removed. "She was very upset and there was quite a bit of commotion". Plaintiff's daughter asked for the referral card prepared by Dr. Martin but was told that it was locked up.

Plaintiff was nervous and upset and cried all the way home. She was put to bed immediately and remained in bed for several days. Her mouth began to swell, her face turned black and her fingers became numb. She was then admitted to Trinity Lutheran Hospital where she remained four days for treatment. She now wears full dentures. Her teeth pop up when she tries to eat and move up and down when she drinks liquids.

She remains in a nervous condition and is bothered with numbness in her right hand and blurring of vision.

Dr. Klee did not recall whether he had anything to do with the extractions but stated he could have done some part of it. Dr. Webb testified he had no recollection of talking to plaintiff about what teeth were to be extracted or discussing the X-rays with her. He stated there was no decay present in four of her lower teeth. Further testimony of Dr. Webb is quoted as follows:

"Q. Isn't that pretty much up to the patient what they would do with reference to a partial plate, if they wanted a partial plate? A. No sir.

"Q. Couldn't they have that if they wanted that? A. That all depends. I don't think so. I think you should strive to do for the patient what is the best thing over a long period of time for the patient. We tried to abide by that.

"Q. Isn't that up to the patient? A. No, I don't think it should be. If they go to a doctor they should discuss it. He should decide. The patient should agree that that is what is to be done and should be done.

"Q. Isn't this up to the patient? If I want to pay $800.00 for a partial, I hope the dear Lord let's me keep my teeth. If I want to keep these teeth, can't I do it? A. You don't know whether they are causing you trouble.

"Q. That is up to me, isn't it? A. Not if you come to see me it wouldn't be."

■ The narrated evidence is amply sufficient to support the jury's conclusion that plaintiff did not intend the extraction of the eight teeth and that she did not consent to their removal. We do not consider here whether or not the teeth needed removal. That question was not submitted to the jury as a predicate to plaintiff's right to recover.

When plaintiff submitted herself to defendants for their services, she was not granted personal consultation. Through no fault of hers, it was not her privilege to speak to defendants in person and state what she wanted them to do. Her disappointment in this respect was shown by the question she asked when she realized she was going into narcosis: "Don't I even get to see the dentist going to do the work?" And, when the dentist did appear, communication was limited to a brief personal exchange—ended by the hypodermic injection of sodium pentothal to induce complete anaesthesia.

■■ Since defendants chose to receive plaintiff's instructions from the card alone, they are bound by its contents. It conferred no greater extent of consent or authority than to "Remove all uppers and both lower 2nd bicuspids". *The card was a limitation of consent, restricted to the specified teeth.* It was notice to defendants of plaintiff's intention to have *only* her upper teeth and two lower bicuspids removed, and to refrain from pulling any others.

Defendants insist that a verdict should have been directed in their favor because plaintiff signed a paper entitled "Permit for Operation", containing the following words: "This is to certify that I, the undersigned, consent to the performing of whatever operation may be decided upon to be necessary or advisable, and the use of local or general anesthetic as indicated. I desire to have Extraction or Surgery as shown upon the examination chart above." They argue that the "Permit" was general authority for them to take out all of plaintiff's teeth. They say the paper was a written instrument which plaintiff should have read, and that she is estopped from avoiding it by her failure to do so. In support of this proposition defendants rely upon the general law of contracts and cases involving commercial contracts and releases.

■ This question is not to be ruled by the law of trade and commerce governing transactions between parties who deal at arms length in the market place. It is to be viewed in the light of the physician-patient relationship which existed between the parties, since the rules and standards governing the duty and liability of physicians in the performance of professional services are applicable to practitioners of the kindred branches of the healing art, including dentists. 41 Am.Jur. Physicians and Surgeons, Sec. 88.

■ A physician occupies a position of trust and confidence as regards his patient—a fiduciary position. It is his duty to act with the utmost good faith. This duty of the physician flows from the relationship with his patient and is fixed by law—not by the contract of employment. 21 R.C.L. 379; Parkell v. Fitzporter et al., 301 Mo. 217, 256 S.W. 239, 29 A.L.R. 1305. The law's exaction of good faith extends to all dealings between the physician and the patient. A person in ill health is more subject to the domination and influence of another than is a person of sound body and mind. The physician has unusual opportunity to influence his patient. Hence, all transactions between physician and patient are closely scrutinized by the courts which must be assured of the fairness of those dealings. In regard to any contract between physician and patient, it is the rule that the physician has the burden of proving that the patient entered into it voluntarily and advisedly, and without undue influence. 41 Am.Jur., Physicians and Surgeons, Sec. 74.

■ The "Permit" that plaintiff signed fails to stand the test of the rule. The circumstances surrounding the transaction negative any idea that she signed the paper understandingly or executed any knowing consent by signing the document. She was under the influence of a narcotizing drug and was going to sleep. She didn't have her glasses and was unable to read. The nurse told her it was only a formality and held the paper for plaintiff's signature, which was obligingly affixed, although in the wrong space—an act not remembered by plaintiff.

The "Permit for Operation" is a vague document. Although it purports to refer to an "examination chart above", it contains nothing, in reasonably intelligible form, to show what teeth defendants proposed to extract. The evidence tends strongly to show that any marks on the paper to indicate intended extractions were made by Dr. Webb after plaintiff signed it, and after she received the anaesthetic. Of further importance is the fact that when plaintiff was asked to sign the "Permit" she had received no advice or information of any nature from defendants. Neither of them had examined or consulted with her. She never saw her dental X-rays. Defendants withheld from her all facts which could have formed the basis of any intelligent consent to extract any more of her teeth than authorized by the referral card. It was not possible that she could give *knowing* additional consent. Full disclosure by the physician is necessary for an informed consent by the patient. Salgo v. Leland Stanford, Jr. et al., 154 Cal.App. 2d 560, 317 P.2d 170.

■ Even if it be assumed that plaintiff read the paper and understood its contents, we consider it only as a written confirmation of the consent already granted by the referral card—not as blanket authority to remove all of her teeth. In Valdez v. Percy, 35 Cal.App.2d 485, 96 P. 2d 142, 145, the plaintiff sued surgeons for removing her breast without her consent. The doctors contended they were given authority for that operation by an agreement signed by plaintiff which stated: "The undersigned patient and others hereby consent to any and all of the medical and surgical treatments, including operations, * * * which may be deemed advisable * * *". The appellate court commented on the "agreement" as follows: "However, we do not understand such agreement to

constitute a consent to perform operations other than the one for which the operating surgeons were engaged by plaintiff to perform unless necessity therefor arose during the authorized operation as hereinbefore mentioned * * *." We apply the quoted statement to our understanding of the "Permit for Operation" in this case. Whether or not, under all the facts and circumstances in evidence, plaintiff consented to the removal of the eight lower teeth was a question of fact which was properly submitted to the jury upon sufficiently supporting evidence.

Defendants claim error in plaintiff's Instruction No. 2, which, they say, is "to the effect that the plaintiff was not bound by her written permit for operation by reason of not reading or examining the same". The foregoing is not a correct statement of the purport of the instruction.

Instruction No. 2 informed the jury "that you may find under Instruction I (plaintiff's verdict-directing instruction) that plaintiff did not give permission or consent to defendants to extract eight of her lower teeth even though you find plaintiff signed for defendants a form described as 'Permit for Operation' * * *"—*if they found and believed these further facts:* (1) that plaintiff was referred to defendants by Dr. Martin and delivered the referral card which stated that all upper and both lower second bicuspid teeth were to be removed; (2) that prior to the extractions plaintiff did not read or examine the "Permit for Operation"; (3) that no one consulted with plaintiff about removing all her lower teeth; (4) that prior to the extractions no one advised plaintiff of any intention to remove all her teeth; (5) that under all facts and circumstances plaintiff did not, in fact, consent to extraction of the eight teeth.

Our discussion of the previous point is applicable to and dispositive of defendants' complaint of Instruction No. 2. In our opinion the instruction is not erroneous or prejudicial.

Defendants finally insist that the verdict is excessive. We do not concur in that view. The evidence touching plaintiff's loss and damage justifies the award. The verdict bears no indication of passion or prejudice on the part of the jury.

The judgment is affirmed.

All concur.