[Civ. No. 33881. Second Dist., Div. Five. June 21, 1971.]

MARY MARGARET RAINER et al., Plaintiffs and Appellants, v. COMMUNITY MEMORIAL HOSPITAL et al., Defendants and Respondents.

## COUNSEL

Lillian Finan and Edward L. Lascher for Plaintiffs and Appellants.

Archbald, Zelezny & Spray, Malcolm Archbald, Overton, Lyman & Prince, Alan L. Rushfeldt, Fred S. Lack, Jr., Benton, Orr, Duval & Buckingham and Edwin Duval for Defendants and Respondents.

## OPINION

**AISO, J.**—Plaintiff Mary Margaret Rainer and her parents[1] brought this action for medical malpractice claiming damages as the result of a colec-

---

[1]For the sake of simplicity, we use the singular form "plaintiff" except when necessary to speak of her mother, Mrs. Sarah Rainer, in count VII of the amended complaint wherein she sued in her own right. The suit was first instituted on February 27, 1963, when plaintiff was a minor 16 years of age. She, therefore, sued

tomy[2] and an ileostomy performed on plaintiff on June 20, 1960, and seven subsequent operations from February 28, 1962, to, and including, September 4, 1962.

The case was tried to a jury on plaintiff's first amended complaint, as amended, which purported to plead various theories of recovery in seven counts against various combinations of defendants, which included defendant Community Memorial Hospital (erroneously named "Buena Community Memorial Hospital" in the complaints; hereafter "hospital") and defendants Drs. David C. Fainer, James W. Moore, J. F. Gstettenbauer, Woodrow W. Schmela, Henry J. Rulfo, and W. E. Peterson.[3] The jury returned a verdict which awarded plaintiff $7,500 against defendants hospital, Dr. Moore, and Dr. Gstettenbauer "in connection with the issues involving the sponge left in the May 24, 1962 surgery," but found against plaintiff and her mother, Mrs. Sarah Rainer, on every other issue submitted to it. Plaintiff and her mother[4] appeal from the judgment entered on the jury verdicts.

## I.

Plaintiff[5] advances the following contentions of error: (1) The trial court erred in foreclosing from jury consideration (a) the issue of "informed consent" as to (i) the initial operation of June 20, 1960, and (ii) the coccygectomy[6] in course of the May 24, 1962, operation, and (b) the question of the independent negligence of the hospital by denial of plaintiff's requests

originally through her father, Raymond J. Rainer, as her guardian ad litem. Since she had reached majority at the time of trial, she was then substituted in as plaintiff in her own right.

[2]Definitions of medical terms are taken from Dorland's Medical Dictionary (23d ed. 1961) unless otherwise noted.
Colectomy: "Excision of a portion of the colon or of the whole colon."
Ileostomy: "Surgical creation of an opening into the ileum."
Ileum: "The distal portion of the small intestine. . . ."

[3]In count VI, the father and mother sued for special damages, viz., medical expenses, loss of minor's earnings, and cost of her future support as the result of the May 24, 1962, operation. Trial counsel for plaintiff (attorney Lascher was associated only as appellate counsel) and her parents dismissed this count at trial. She also dismissed the action in course of trial, against defendants Drs. Schmela, Rulfo, and Peterson, who were radiologists.

[4]Although the notice of appeal uses the word "plaintiffs" as appellants, we construe this to mean plaintiff and her mother from the fact that her father, Raymond J. Rainer, was no longer a party to the action when the case went to the jury.

[5]This includes the mother, Mrs. Sarah Rainer, where pertinent.

[6]Coccygectomy: "Excision of the coccyx."
Coccyx: "The small bone situated caudad [toward the tail] to the sacrum in man, the caudal end of the spinal column, formed by the union of four rudimentary vertebrae."

to amend pleadings, exclusion of evidence proffered thereon, and refusal of certain instructions requested by plaintiff. (2) The trial court erred in giving erroneous instructions. (3) It erred in interjecting the "danger to the doctors' reputations" into the case. (4) The verdict forms and lack of instructions concerning them confused the jury.

We have concluded that plaintiff should have been permitted to have her claims of lack of "informed consent" litigated, but that all the other contentions of error are not well taken.

## II.

The factual and evidentiary matters necessary to the understanding and disposition of the points raised on appeal are set forth below, but the narrative is not intended to be exhaustive.[7] Matters relevant to the issue of whether plaintiff should have been permitted to amend pleadings will be detailed when we treat that issue.

Plaintiff Mary Margaret Rainer, born August 11, 1946, commenced having bowel problems in May 1957. Her pediatrician referred her to defendant Dr. James W. Moore, a surgeon, in September 1957. He examined plaintiff physically and diagnosed her problem as ulcerative colitis.[8]

Ulcerative colitis is a disabling disease characterized by periodic flare-ups and remissions. Its cause is unknown. Drugs and medication palliate the symptoms, but have no perceptible effect upon arresting progression of the disability nor upon minimizing the likelihood of its recurrence. Symptoms of cancer, perforation, and other complications, which may be fatal, are frequently not recognizable until it is too late. There is no known "cure" short of removing the afflicted organs by surgery; it is undisputed that surgery is required in about 15 percent of all such cases. Whether surgery is necessary in any given case depends upon the facts and circumstances peculiar to that case.

Dr. Moore referred plaintiff to defendant Dr. David C. Fainer, an internal medicine specialist with a sub-specialty in gastroenterology,[9] who was plaintiff's treating physician from September 1957 to June 1960. After her first visit to Dr. Fainer, plaintiff was placed on a diet and given azulfidine as medication. When she returned on September 21, 1957, Dr. Fainer performed a sigmoidoscopy, which is an examination of the colon between

---

[7] The reporter's transcript is approximately 2,386 pages and the clerk's transcript 413 pages, together with lengthy exhibits such as the hospital records.

[8] Ulcerative colitis: "Chronic ulceration in the colon."

[9] Gastroenterology: "The study of the stomach and intestines and their diseases."

the descending colon and rectum by means of a speculum. A speculum is an appliance for opening a passage of the body to view.

In December 1958 and January 1959, plaintiff suffered flare-ups requiring her hospitalization. She was treated with depomedrol, the preferred drug for conditions such as manifested by plaintiff, but it had to be discontinued because it caused mental disturbances in plaintiff. During this hospitalization, Dr. Fainer performed another sigmoidoscopy and he recorded that plaintiff had chronic ulcerative colitis. It appears that no subsequent sigmoidoscopy was performed prior to the colectomy; Dr. Fainer testified that plaintiff objected to such an examination because of the discomfort it caused her.

X-ray studies made between September 1957 and April 1960 indicated a steady progression of the pathologic condition, plaintiff's colon continuing to shrink, shorten, and become more rigid and narrow. In December 1959, the possibility of a polyp in the descending colon was noted on some of the X-rays then taken. In April 1960 a radiologist's report indicated "[t]hree filling defects, having the appearance of polyps, are noted in the descending colon." By April, it appeared that the "polyps" were growing rapidly and that the growth might be cancerous. Dr. Fainer felt there was a possibility that these "polyps" were harbingers of cancer. Plaintiff's colon continued to shrink considerably during this four-month period during which she continued to have low-grade symptoms. The April 1960 X-rays were the last taken prior to the colectomy.

In the opinion of defendants Drs. Fainer and Moore, surgery to remove the pathologic colon was now necessary. Accordingly, they recommended it to plaintiff's mother. Plaintiff, in her first cause of action, charged the several defendants named therein (including Drs. Fainer and Moore) with having "negligently advised plaintiff that she needed surgical treatment consisting of a colectomy and an ileostomy for her condition." There is no allegation that the surgical operation itself was negligently performed.

While the evidence on whether the advice relative to the need for surgery comported with the learning, skill, and care of physicians and surgeons of good standing under similar circumstances is disputed, the finding of the jury that the advice was within that standard[10] finds support in the testimony of four non-party doctor witnesses, as well as in the testimony of several doctors named as defendants. Dr. Wiley F. Barker, a practicing surgeon and a full professor of surgery at U.C.L.A. Medical School, testified: The development of a mass lesion (i.e., the polyp) was indicative of

---

[10]We explain later how the jury made separate findings on various issues or episodes.

the possible development of cancer. This possibility made an operation mandatory, since in his opinion the whole colon was diseased calling for its total excision. He also testified that no medication would provide protection against such a mass in the colon. Dr. Morton Grossman, who also taught in the field of gastroenterology at U.C.L.A., testified that in instances such as that manifested by plaintiff, he would recommend surgery because of the increasing danger of the disease to the patient's life and health. The possibility of cancer, he also pointed out, is very greatly increased in persons with ulcerative colitis; and if cancer does develop, it is usually fatal. Drs. Leo J. Tauber and George E. Scott, internal medicine specialists from the Santa Barbara-Ventura area, also testified that in their opinion surgery was the proper procedure given the symptoms exhibited by plaintiff.

In the hospital report, Dr. E. F. Ducey, the hospital's pathologist noted that the "inflammatory process ends rather abruptly at the edge of the inner muscle layer." He further reported that "three small polyps noted grossly do not represent true neoplasm [new tissue], but simple redundant folds of mucosa and submucosa. . . ." Dr. Ducey concluded: "The picture is that of subacute and chronic colitis of idiopathic nature, without any ulceration at the present time; the extreme degree of edema and eosinophilia [rose colored stain] suggest an allergic response." Diagnosis: "Colitis, chronic, idiopathic, active, with pseudo-polyp formation. Mesocolic lymph adenitis,[11] secondary to above. Fecal stasis in appendix." Dr. D. Gordon Johnston, a pathologist called as a defense witness, testified that he had made an examination of the preserved specimen and disagreed with Dr. Ducey's conclusions. He was of the opinion that the colon was ulcerated. Dr. Ducey was no longer in the Ventura area at time of trial.

On February 28, 1962, after plaintiff had sufficiently recovered from the June 20, 1960, operation, her ileum was reconnected to the rectal stump. Plaintiff did not allege any negligence with respect to this operation.

A short time later, on March 14, 1962, a loop or venting ileostomy was performed to divert the fecal matter from the rectum because it was being driven into the vagina from the rectum through a rectovaginal fistula[12] (the suture line) which needed time to heal. Plaintiff charged that this operation was negligently performed by defendants hospital, Dr. Moore, and Dr. Gstettenbauer. However, the jury's finding of non-negligence is supported by the evidence. Dr. Barker testified that the operation was

[11]Adenitis: "Inflammation of a gland."
[12]Rectovaginal fistula: "An abnormal opening between the rectum and vagina."

appropriate and necessary and that it was performed within the standard of care of a general surgeon under like circumstances.

On March 27, 1962, an emergency operation for a bowel obstruction was performed.

On May 9, 1962, the loop or venting ileostomy was closed. Plaintiff averred that this operation was negligently performed by defendants hospital, Dr. Moore and Dr. Gstettenbauer. The jury verdict on this issue against plaintiff finds support in Dr. Barker's testimony that this taking down of the ileostomy was properly done since the results of an examination indicated that the fistula in question had healed.

It subsequently turned out, however, that the fistula had not in fact completely healed. Consequently, on May 24, 1962, Drs. Moore and Gstettenbauer had to perform another surgery to repair the rectovaginal fistula which had reopened. The doctors were faced with two alternative surgical procedures: (1) an anterior approach through the abdomen, and (2) a posterior approach. The jury found the selection of the posterior approach as not having been negligent. At the time the choice was made, plaintiff's abdomen had been entered by five previous operations. An abdominal approach at the time would have risked infection in the peritoneal cavity. The posterior approach permitted the surgeons to see the fistula better. Plaintiff's coccyx was removed as an incident to this posterior approach to permit more exposure and better view of the operating site. The first amended complaint alleged that the removel of the coccyx was unauthorized.

Also during this May 24, 1962, repair to the fistula, plaintiff's ureter was injured. Since no leakage or other sign of damage was noticeable until two or three weeks later, the cause of the injury was probably a suture. It takes catgut sutures two or three weeks to dissolve. The evidence conflicted as to whether an injury of this type could or could not occur without negligence. A conditional res ipsa loquitur instruction was given relative to this ureter damage. The surgeons were operating in a markedly indurated and infected area where dissection was extremely difficult. The ureter could not be seen during the operation. The testimony was that even if the abdominal approach had been made, the ureter would not have been visible. Dr. Moore and Dr. Barker both testified that the injury of the ureter of the nature which occurred here could have transpired without negligence. Consequently, the jury verdict exonerating the defendants on the ureter issue is supported by the evidence.

During this May 24, 1962, operation, a surgical sponge was left in the muscles of plaintiff's left buttocks. Defendants admit that the finding of

the jury that this constituted negligence was proper; they do not appeal. The jury awarded plaintiff damages of $7,500 jointly against the defendant hospital, Dr. Moore, and Dr. Gstettenbauer on this sponge episode. Judgment was entered for this amount.[13]

Hospitalization and surgery on July 10 and July 25, 1962, by Dr. David N. Grey, a board-certified urologist to whom Dr. Moore had referred plaintiff, were required to repair the damage to the ureter. On September 4, 1962, plaintiff underwent further surgery by Dr. Grey, assisted by Dr. Moore, at which time a second cystoscopy and retrograde pyelogram to ascertain the continued drainage of urine were also performed (the first cystoscopy and pyelogram had been performed on July 10) and the surgical sponge found and removed.

Plaintiff prayed for $600,000 general damages and medical, incidental expenses, and loss of earnings. Mrs. Sarah Rainer, the mother, prayed for loss of earnings according to proof. The jury found against the mother's claim. Other facts will be added where pertinent to the point under discussion.

### III.

We first take up plaintiff's claim that she should have been permitted to have the jury determine the question of "informed consent" both as to the original operation (June 20, 1960) and the removal of her coccyx (May 24, 1962). The mother, Mrs. Sarah E. Rainer, had signed written consents to the operations which took place on those two dates.[14] She was a registered nurse and had worked at times at the hospital from 1946 to 1960 and at Oxnard Community Hospital thereafter. She could recall having cared for one or two ileostomy patients herself.

Mrs. Rainer was the first witness to testify. On her direct examination, she testified that prior to the June 20, 1960, operation Dr. Fainer told her that the X-rays had shown polyps, that the X-rays had been sent down to U.C.L.A. to be studied by the several doctors down there, that they all agreed with Dr. Fainer's diagnosis and that of Dr. Moore that the polyps presented a danger of malignancy and that although plaintiff was only 13

---

[13]Recovery of costs of suit was precluded by an offer to allow judgment for $28,000, plus costs of suit, in favor of all plaintiffs which was filed by all defendants in February 20, 1968. (Code Civ. Proc., § 997). Plaintiff was permitted to proceed *in forma pauperis* without advancing jury fees in this six weeks' jury trial, subject to a lien in favor of the County of Ventura on any recovery by plaintiff "to recoup the amount of jury fees that ordinarily a party would have to absorb."

[14]The consent of a parent is the proper one when the patient is a minor, not authorized otherwise by law (see Civ. Code, §§ 25.5, 25.6, 25.7, 25.8), incapable of giving consent. (Cf. *Farber* v. *Olkon* (1953) 40 Cal.2d 503, 509 [254 P.2d 520].)

years old, surgery was essential to prevent the possibility of "it becoming malignant with the polyps there." She also testified that two or three weeks prior to that particular surgery she had spoken to Dr. Moore and asked him why surgery was required at that time. He replied that "it was because there were polyps and the danger of malignancy." Mrs. Rainer was then asked why she had consented to the operation. She replied, "Because I had faith in Dr. Moore and Dr. Fainer and I believed what—that the X-rays and everything had been studied by the doctors in U.C.L.A. because I felt that if they said it was necessary that it was necessary." She was then asked, "Would you have so consented to this colectomy if you had known that there was not a definite diagnosis of polyps and that there was no consultation with the doctors down at U.C.L.A.?" She was permitted to answer, "No, ma'am," over defense objections and upon condition that it be "connected up." The question was repeated: "You would not have consented had you know[n] there wasn't a definite diagnosis of polyps and they had not consulted with these surgeons and doctors down at U.C.L.A., is that correct?" The answer was, "No ma'am."

The following morning counsel for Drs. Fainer, Moore, and Gstettenbauer renewed their objections on grounds that neither the issue of "informed consent" nor of "assault and battery" was pleaded. The trial judge agreed. Plaintiff's counsel contended: "I do believe that as the evidence develops it might just well be brought out that, in fact, there was not an informed consent and at that time I would ask either—I would amend the pleadings to state so specifically." The trial court ordered the questions and answers stricken and it instructed the jury to disregard them.

At the conclusion of plaintiff's case in chief, plaintiff's counsel asked to amend her pleadings to conform to proof "to add a cause of action against Dr. Moore for battery for the coccygectomy for which he had no consent, so admitted, and to add to my request for damages on that count the sum of $100,000, and . . . to add to the first cause of action against Drs. Moore and Fainer a paragraph . . . that the consent that they obtained to do the colectomy was uninformed because it was obtained on a misrepresentation of the facts." Objections were interposed upon the ground that the proposed amendment was injecting a new cause of action and that the motion was not timely.

The motion was denied. Plaintiff also requested the giving of the two instructions, which construed together embodied principles announced in *Salgo* v. *Leland Stanford etc. Bd. Trustees* (1957) 154 Cal.App.2d 560 [317 P.2d 170], which the court refused to give.[15]

---

[15]We do not decide whether the requested instructions were appropriate. We mention the request only to indicate nonabandonment of the consent issue.

We agree that the question of "informed consent" with reference to the June 20, 1960, operation was not pleaded. In paragraph XII of the first count of the amended complaint in question, plaintiff alleged that the six defendant doctors originally named, "negligently advised plaintiff that she needed surgical treatment consisting of a colectomy and an ileostomy for her condition" and that acting upon such recommendations, she authorized Drs. Moore and Gstettenbauer to perform the colectomy and ileostomy performed on June 20, 1960. This does not present any issue of whether the consent was informed or otherwise. Nor does it plead a battery.

In her third count, there is alleged that on May 24, 1962, in course of repairing a rectovaginal fistula from the posterior approach, defendant hospital, Dr. Moore, and Dr. Gstettenbauer "removed plaintiff's coccyx, without authorization."

The real issue for our determination is whether the trial court abused its discretion in foreclosing jury consideration and determination of the questions subsumed under plaintiff's expression "informed consent" because of the unworkmanlike manner and point of time when they were sought to be raised. We agree that pleadings should not be apotheosized as ends in themselves, but it cannot be gainsaid that they have a proper place and function in the orderly, efficient, and fair administration of justice. ■ "One of the functions of pleadings is to limit the issues and narrow the proofs. . . . Evidence which is not pertinent to the issues raised by the pleadings is immaterial, and it is error to allow the introduction of such evidence." (*Fuentes* v. *Tucker* (1947) 31 Cal.2d 1, 4 [187 P.2d 752].) We think this is still the basic rule. ■ Plaintiff's appellate counsel denigrate the nature and function of pleadings when they cavalierly characterize a defendant's insistence on advance notice of issues to be raised at trial as a "gamesmanlike ploy"[16] and confinement of proof to issues pleaded as a "discredited wheeze." Nevertheless, there are exceptions to the basic rule where the facts and circumstances of a given case make a departure exigent to prevent what appears to be a miscarriage of justice because of

---

[16]Who is playing games? (See Plante, *An Analysis of "Informed Consent"* (1968) 36 Fordham L.Rev. 639-640.) Is it unreasonable to ask of counsel who institutes a law suit charging a member of another learned profession with a failure to exercise that reasonable degree of knowledge, skill, and care possessed and exercised by members of that profession under the same or similar circumstances to pause to reflect and apply to his own work product the principles of professional knowledge, skill, and care so easily extrapolated from the charges he is making? Aside from the pleading defects raised in this appeal, we note also that the alleged second cause of action which appears to have been intended to sound in negligence lacks an allegation of negligence. "When inexcusable neglect is condoned even tacitly by the courts, they themselves unwittingly become instruments undermining the orderly process of the law." (*Transit Ads, Inc.* v. *Tanner Motor Livery, Ltd.* (1969) 270 Cal.App.2d 275, 282 [75 Cal.Rptr. 848].)

an attorney's shortcomings. Legislative recognition of the need of leaving room for some play in the joints of our rules of pleading is found in sections 473 and 576 of our Code of Civil Procedure.[17] It requires no citation of authority that our decisional law holds that these two code sections are to be construed liberally so that cases might be tried upon their merits in one trial where no prejudice to the opposing party or parties is demonstrated. It has even been held that no abuse of discretion transpired even though an amendment was permitted at the outset of the trial even though the neglect was not excusable but no prejudice resulted to the opposing party. (*Deetz* v. *Carter* (1965) 232 Cal.App.2d 851, 857 [43 Cal.Rptr. 321]; *Fuller* v. *Vista Del Arroyo Hotel* (1941) 42 Cal.App.2d 400, 405 [108 P.2d 920].) Similar rulings have been made where the parties objecting to the amendment were not taken by surprise. (*McDougald* v. *Hulet* (1901) 132 Cal. 154, 161 [64 P. 278]; *Daum Development Corp.* v. *Yuba Plaza, Inc.* (1970) 11 Cal.App.3d 65, 75 [89 Cal.Rptr. 458].)

■ Where additional investigation and discovery is not required to meet the new issue, it would appear that it would constitute an abuse of discretion not to permit the amendment of a complaint even at the outset of a trial, where the amendment merely adds a new theory of recovery on the same set of facts constituting the cause of action (*Austin* v. *Massachusetts Bonding & Insurance Co.* (1961) 56 Cal.2d 596 [15 Cal.Rptr. 817, 364 P.2d 681]). (Cf. *Barba* v. *Superior Court* (1966) 239 Cal.App.2d 572 [49 Cal.Rptr. 60] (request to add allegation that vehicle was being driven with defendant's consent); *Read* v. *Safeway Stores, Inc.* (1968) 264 Cal. App.2d 404 [70 Cal.Rptr. 454] (request to amend pretrial order to include strict liability as well as negligence); *Saari* v. *Superior Court* (1960) 178 Cal.App.2d 175, 180 [2 Cal.Rptr. 856] (request to add a wilful and wanton count to negligence after a reversal on appeal).)

■ Although plaintiff's counsel did at times use the term "informed consent" in connection with amending the pleadings, the consent issue

---

[17]Code of Civil Procedure section 576: "Any judge, at any time before or after commencement of trial, in the furtherance of justice, and upon such terms as may be proper, may allow the amendment of any pleading or pretrial conference order."

Code of Civil Procedure section 473: "The court may, in furtherance of justice, and on such terms as may be proper, allow a party to amend any pleading . . . by correcting . . . a mistake in any . . . respect. . . . The court may likewise, in its discretion, after notice to the adverse party, allow, upon such terms as may be just, an amendment to any pleading. . . ."

3 Witkin, California Procedure (2d ed. 1971) Pleading, pages 2627-2628: "Amendments during the trial may be allowed. (C.C.P. 473, 576 ['at any time before or after commencement of trial, in the furtherance of justice'].) And, where the delay is excusable and no prejudice to the adverse party is shown, the liberal rule of allowance prevails, usually subject to the conditions of continuance and payment of costs."

here did not involve all of the complexities which that compendious term often presents. Judging from the questions and answers objected to, plaintiff was seeking to resort to the well known doctrine that an ostensible consent is vitiated if obtained by a misrepresentation of a material fact, which would lay the basis of liability on the theory of a battery. (*Custodio* v. *Bauer* (1967) 251 Cal.App.2d 303, 313-314 [59 Cal.Rptr. 463]; see Prosser on Torts (3d ed. 1964) p. 107.) When the question of "informed consent" was first raised early in the direct examination of Mrs. Rainer, defendants urged only that there was no issue of "assault and battery" within the pleadings. There was no remonstrance against plaintiffs raising the issue on the ground that defendants were taken by surprise or that additional investigation would be required, which would necessitate an interruption and a continuance of the trial proceedings.

The vehemence of their objection that the matter was not within the pleadings is some indication of the materiality of the issue to the overall litigation between the parties. (See *Hayes* v. *Richfield Oil Corp.* (1952) 38 Cal.2d 375, 382 [240 P.2d 580]; *Edelman* v. *Zeigler* (1965) 233 Cal.App.2d 871, 883 [44 Cal.Rptr. 114].) ■ In California, it appears pretty well settled that an operation without a valid consent constitutes a "battery." (*Weinstock* v. *Eissler* (1964) 224 Cal.App.2d 212, 233 [36 Cal.Rptr. 537]; *Hundley* v. *St. Francis Hospital* (1958) 161 Cal.App.2d 800, 806 [327 P.2d 131]; *Valdez* v. *Percy* (1939) 35 Cal.App.2d 485, 491 [96 P.2d 142]; see Cal. Tort Guide (Cont.Ed.Bar 1971) § 8.8, p. 107.) An action for a battery can lie even though the surgery or medical treatment is skillfully performed (*Berkey* v. *Anderson* (1969) 1 Cal.App.3d 790, 803 [82 Cal.Rptr. 67]; *Pedesky* v. *Bleiberg* (1967) 251 Cal.App.2d 119, 123 [59 Cal.Rptr. 294]; *Kritzer* v. *Citron* (1950) 101 Cal.App.2d 33, 38 [224 P.2d 808]), so that the jury verdicts finding no negligence do not preclude the seeking of relief on this theory, where the issue is raised in the same action. ■ Nor was the claim of battery being a new cause of action valid; it constituted only a new theory of recovery. (*Weinstock* v. *Eissler* (1964) *supra,* 224 Cal.App.2d 212, 234, 235.)

We do not determine here whether the claimed misrepresentations constituted misrepresentations of material facts. All we decide is that there was an issue as to their materiality raised and that plaintiff should have been given the opportunity of litigating the issue. Since the rulings of the court concerning the question of valid consent *vel non* to the June 20, 1960, operation foreclosed plaintiff's theory of recovery which cannot be ruled to lack merit as a matter of law, abuse of discretion resulted where no showing of prejudice was made by defendants. (*Dunzweiler* v. *Superior Court* (1968) 267 Cal.App.2d 569 [73 Cal.Rptr. 331], and cases there cited.) An amendment to pleadings so that the issue of consent to the June 20, 1960, operation could have been fully litigated should have been per-

mitted when the request to amend was first made. It was an abuse of discretion to deny the amendment. (Cf. *Wall* v. *Brim* (5th Cir. 1943) 138 F.2d 478, 479, fn. 3, 481.)

## IV.

■ Moving to the question whether the removal of the coccyx, in the course of the May 24, 1962, operation, was pursuant to a consent, a different situation prevails. The first amended complaint did allege as a part of paragraph IV of the third cause of action, that "[d]efendants, and each of them, chose a bizarre method to do the aforesaid [rectovaginal fistula] repair by using a posterior approach, during which they removed plaintiff's coccyx, without authorization." The written consent signed by Mrs. Rainer states that it is an authorization of a "repair of fistula." Under "preoperation diagnosis" on the same sheet, there is a handwritten entry, "recto-vag fistula." Mrs. Rainer testified that Dr. Moore did not tell her prior to this operation that he was going to perform a coccygectomy on plaintiff. Dr. Moore himself admitted that there was no specific consent to the coccygectomy. Plaintiff did not abandon her claim for the unauthorized removal of her coccyx, as evidenced by her counsel's request to conform her pleadings to proof, which request we have heretofore detailed. Counsel for Drs. Moore and Gstettenbauer objected on the ground set forth in the margin.[18] ■ Consent to an operation carries with it a consent to remove an organ or body tissue which is a normal incident to the operation (*Bradford* v. *Winter* (1963) 215 Cal.App.2d 448, 454 [30 Cal.Rptr. 243]), but such a consent does not carry with it permission to remove a different organ or one which is not normally excised as an incident to the operation consented to (*Hundley* v. *St. Francis Hospital* (1958) *supra,* 161 Cal.App.2d 800, 803, 806; *Valdez* v. *Percy* (1939) *supra,* 35 Cal.App.2d 485, 491). ■ Opportunity was not given plaintiff to explore whether the written consent should be limited to a "repair of fistula." It may also be that under the liberalized parol evidence rule (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39 [39 Cal.Rptr. 561, 442 P.2d 641]) Drs. Moore and Gestettenbauer

---

[18]"Regarding the first request for amendment to allege assault and battery for a coccygectomy, since Dr. Moore's deposition was first taken in 1964, your Honor, it has been known that in connection with the posterior approach to repair the rectovaginal fistula a coccyx was removed. This was not an operation for a coccygectomy, only except as incidental. We at no time expected to have a big froo-haw as to whether or not a coccygectomy as such was performed, but the facts have been known since earlier than 1964. [¶] Under these circumstances, we think that it would be prejudicial to inject another element into the lawsuit which has been known over four years."

can show that the written consent carried with it a permission to remove the coccyx as an incident to the fistula repair.

Unfortunately, counsel for both plaintiff and Drs. Moore and Gstetten-bauer against whom, along with the hospital, the third cause of action was averred failed to call the trial court's attention to the allegation that the coccyx had been removed without authorization. The two doctors consequently cannot claim surprise. They did not interpose a special demurrer, which could have been done upon the ground that two causes of action had been pleaded in a single court. (*Ehlen* v. *Burrows* (1942) 51 Cal. App.2d 141, 143-144 [124 P.2d 82].) ■ A negligent act and a battery pleaded in a single count may be construed as setting up both theories of recovery. (*Estrada* v. *Orwitz* (1946) 75 Cal.App.2d 54, 57 [170 P.2d 43]; cf. *Read* v. *Safeway Stores, Inc.* (1968) *supra,* 264 Cal.App.2d 404, 406.) ■ An amendment should be permitted to improve a poorly pleaded issue. (*Alexander* v. *Bames* (1942) 54 Cal.App.2d 387, 392 [128 P.2d 920].)

■ Whether the written consent to the rectovaginal fistula repair included an implied consent to the removal of the coccyx and whether Mrs. Rainer as a registered nurse was aware of the possibility, were questions of fact or of mixed law and fact. The medical testimony as to whether the removal of a coccyx impairs the functional ability was in conflict. To recapitulate, the removal of the coccyx without authorization was pleaded and there is some evidence to support a lack of consent. Consequently, it was an abuse of discretion to deny plaintiff's request to improve upon her pleading on the coccyx issue and to prevent the issue from going to the jury for its appraisal and determination.

The foreclosure of this issue from the jury's determination, cumulated to the foreclosure of the question of consent to the June 20, 1960, operation, requires a reversal of the judgment. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].)

## V.

■ Notwithstanding our view endorsing a liberal policy towards permitting the amendment of pleadings at any stage of the trial where no prejudice results to the adverse party or parties, we have concluded that the trial court did not abuse its discretion in denying plaintiff's request to amend her first amended complaint at the outset of the trial in order to plead a theory of independent negligence against the hospital in addition

to the theory of *respondeat superior*.[19] If the motion had been timely made, amendment could have been allowed almost as a matter of course even if it "added a significant new dimension to the lawsuit." (*Grudt* v. *City of Los Angeles* (1970) 2 Cal.3d 575, 583-585 [86 Cal.Rptr. 465, 468 P.2d 825].) In *Grudt* the amendment was made at the pretrial stage. Here plaintiff, without good cause, waited until the third day of trial (February 27, 1968, which was exactly five years to the date after the action was filed)[20] and more than ten months after she had notice of this theory by virtue of the trial court's detailed written discovery order (dated April 14, 1967) pertaining to the pretrial examination of the books and records of the hospital. Upon inquiry by the trial court, plaintiff did not then have the evidence ready to prove the issues even if amendment had been permitted. Defendants objected that the interjection of this new issue would further complicate an already potentially complicated trial before a jury, that no discovery and preparation on the trial of these issues had been made by them, and that matters which might have been the subject of pretrial investigation would not be admissible on trial under Evidence Code section 1156, subdivision (a). Thus prejudice was shown on this aspect of the requests to amend pleadings.  ▉  "A long unexcused delay may be the basis for denying permission to amend pleadings [citations,] especially where the proposed amendment interjects a new issue [citations], which may require further investigation or discovery procedures [citations]." (*Nelson* v. *Specialty Records, Inc.* (1970) 11 Cal.App.3d 126, 139 [89 Cal. Rptr. 540], and cases cited; *Vogel* v. *Thrifty Drug Co.* (1954) 43 Cal.2d 184, 188-189 [272 P.2d 1]; *People* ex rel. *Dept. Pub. Wks.* v. *Jarvis* (1969) 274 Cal.App.2d 217, 222 [79 Cal.Rptr. 175]; *Bernstein* v. *Financial Indem. Co.* (1968) 263 Cal.App.2d 324, 328 [69 Cal.Rptr. 543].) There was no abuse of discretion, under the foregoing circum-

---

[19]The thrust of the amendment was to add: "Defendant hospital negligently failed to live up to the standards practiced by other accredited hospitals in the same or similar localities, in the following particulars, among others: It failed to require consultation with an expert prior to allowing defendant Moore operate on plaintiff; it negligently failed to make every conceivable effort to see that accreditation and licensing standards were being followed both by lay and professional personnel; it failed to restrict the surgical privileges of defendant Moore in spite of the fact that it had notice that defendant Moore, at least one time prior to the surgery herein complained of, had performed unnecessary surgery on another patient."

[20]In fairness to plaintiff's trial counsel, we note that the action was originally filed by other attorneys. The first paper in the clerk's transcript upon which said trial counsel's name appears was filed on March 16, 1966.

The request for amendment appeared to be necessary under *Wysock* v. *Borchers Bros.* (1951) 104 Cal.App.2d 571, 585, 586 [232 P.2d 531] which held that an allegation charging a defendant with carelessly managing and operating a truck under the theory of *respondeat superior* did not raise an issue that defendant was negligent in employing a driver whom he should have known to have been incompetent.

stances, in denying plaintiff's request to add a theory of independent negligence of the hospital at time of trial.

VI.

█ We next deal with plaintiff's contention that certain instructions to the jury were prejudicially erroneous.

### A. *BAJI 214 (Revised).*[21]

Plaintiff asserts that the "same or similar locality" phrase, which appears twice in the instruction given, should be ruled erroneous in that standards of learning and skill to be possessed and care to be exercised by physicians and surgeons should be uniform throughout the state. Unfortunately, medical malpractice is not limited by state lines either as to parties or medical witnesses. (See, e.g., Comment (1962) 14 Stan.L.Rev. 884 cited below.) It may well be that the locality element could be more appropriately subsumed as just one of several factors encompassed in the phrase "under similar circumstances." In *Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 788 [91 Cal.Rptr. 760, 478 P.2d 480], our Supreme Court speaking through Mr. Justice Tobriner omitted the "same or similar locality" phrase as a separate element and merely stated: "The courts require only that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances. (*Sinz* v. *Owens* (1949) 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; *Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 86 [147 P.2d 604]; see Comment, 14 Stan.L.Rev. 884, 891-892.)" All of the authorities cited recognized the locality factor as appropriate, at least under certain circumstances, and *Bardessono* did not explicitly discard the "same or similar locality" holdings therein as now outmoded although it could have done so if that were the current view. This court approved the instruction, in substance, in *Pedesky* v. *Bleiberg* (1967) *supra,* 251 Cal. App.2d 119, 122. (See also *Puffinbarger* v. *Day* (1962) 207 Cal.App.2d

---

[21]This instruction read: "By undertaking professional service to a patient, a physician and surgeon impliedly represents that he possesses, and it is his duty to possess, that degree of learning and skill ordinarily possessed by physicians and surgeons of good standing, practicing in the *same or a similar locality* and under similar circumstances. [¶] It is his further duty to use the care ordinarily exercised in like cases by reputable members of his profession practicing in the *same or a similar locality* under similar circumstances, and to use reasonable diligence and his best judgment in the exercise of his skill and the application of his learning, in an effort to accomplish the purpose for which he is employed. [¶] A violation of any of those duties is a form of negligence that we call malpractice." (Italics added.)

540, 546 [24 Cal.Rptr. 533], expressly holding former BAJI instruction 214, which embraced the "same locality" terminology, as proper.)

In any event, plaintiff does not have standing to raise the objection in this case. Her counsel used the phrase in portions of her pleadings, in questioning witnesses, in her argument, and requested the instruction in the form in which it was given. ■■■ A party may not complain of an instruction given at his request (*Hartman Ranch Co.* v. *Associated Oil Co.* (1937) 10 Cal.2d 232, 250 [73 P.2d 1163]; *Yolo Water & Power Co.* v. *Hudson* (1920) 182 Cal. 48, 51 [186 P. 772]) nor of an instruction given at his adversary's request when one requested by him also contains the same error (*Zuckerman* v. *Underwriters at Lloyd's* (1954) 42 Cal.2d 460, 470 [267 P.2d 777]; *Wells* v. *Lloyd* (1942) 21 Cal.2d 452, 460 [132 P.2d 471]).

## B. *BAJI 214-A (Revised).*[22]

■■■ Plaintiff contends that this instruction confuses negligence in choice of methods of treatment with negligence in the actual performance or administration of treatment. The instant case involved both kinds of negligence. The instruction has been approved as a correct statement of the rule. (*Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420, 434 [71 Cal.Rptr. 903, 445 P.2d 519]; cf. *Pedesky* v. *Bleiberg* (1967) *supra,* 251 Cal.App.2d 119, 122.) If further clarification was needed, plaintiff had the duty of requesting it. (*Dayton* v. *Landon* (1961) 192 Cal.App.2d 739, 744 [13 Cal.Rptr. 703]; *Hopkins* v. *Tye* (1959) 174 Cal.App.2d 431, 433 [344 P.2d 640]; *Ferrate* v. *Key System Transit Lines* (1958) 165 Cal.App.2d 391, 399 [331 P.2d 991].)

Plaintiff complains that the first and third paragraphs of BAJI 214-A (Revised) "amounting to a capsule summary of a defense jury argument, constituted palpable error." While this charge might be true if those two

---

[22]This instruction read: "The law does not condemn a physician simply because his efforts prove unsuccessful. No practitioner can guarantee results. [¶] Where there is more than one recognized method of diagnosis or treatment, and no one of them is used exclusively and uniformly by all practitioners of good standing, a physician and surgeon is not negligent if, in exercising his best judgment, he selects one of the approved methods, which later turns out to be a wrong selection, or one not favored by certain other practitioners. [¶] It is quite possible for a physician or surgeon to err in judgment, or to be unsuccessful in his treatment, or to disagree with others of his profession, without being negligent. [¶] On the other hand, if a physician and surgeon does not possess that degree of learning and skill ordinarily possessed by physicians and surgeons of good standing practicing in the same or a similar locality and under similar circumstances, or if he fails to exercise the care ordinarily exercised by reputable members of his profession in the same or a similar locality and under similar circumstances, it is no defense to a charge of negligence that he did the best he could."

paragraphs stood alone, given in context of the balance of the instruction the charge is not true. (*Black* v. *Caruso* (1960) 187 Cal.App.2d 195, 201 [9 Cal.Rptr. 634].) While certain of the argumentative phraseology could have been appropriately omitted and left to counsel to argue, the statements of law were not inaccurate. (See *Clark* v. *Gibbons* (1967) 66 Cal.2d 399, 408, fn. 4 [58 Cal.Rptr. 125, 426 P.2d 525].)

### C. *BAJI 214-B (Revised)*.[23]

■ Plaintiff contends that this instruction is wrong, especially when given along with res ipsa loquitur instructions, because it does not take care of instances where negligence can be determined from common knowledge. Aside from the common knowledge exception, the instruction has been approved as a correct statement of the law. (*Pedesky* v. *Bleiberg* (1967) *supra*, 251 Cal.App.2d 119, 122; *Gin Non Louie* v. *Chinese Hospital Assn.* (1967) 249 Cal.App.2d 774, 784-785 [57 Cal.Rptr. 906].) Except for the sponge episode, plaintiff points to no other instance where the jury could have determined negligence *vel non* on the basis of common knowledge. On this phase of the case, the court modified an instruction requested by plaintiff and explicitly instructed the jury that the doctrine of res ipsa loquitur was applicable because of the "fact that a sponge was left in the patient." Consequently, rather than confusing the jury, this instruction pointed out that as to this issue there was no need to resort to BAJI 214-B (Revised). The ureter episode likewise was pointed out specifically and a conditional res ipsa loquitur instruction given since there was expert testimony that such damage could occur without negligence under the circumstances of the May 24, 1962, operation. This was a question which was not in the realm of common knowledge. (*Tomei* v. *Henning* (1967) 67 Cal.2d 319, 322 [62 Cal.Rptr. 9, 431 P.2d 633].) Res ipsa loquitur would have applied only if upon the basis of expert testimony it could be said that the damage would not have occurred without the negligence of some one.

The trial judge also instructed the jury to consider the instructions as a whole (BAJI 2 (Revised)), and that all instructions given may not be necessarily applicable (BAJI 35-A) as requested by plaintiff. It is presumed that the jury properly followed these. (*Lynch* v. *Birdwell* (1955) 44 Cal.2d

---

[23]This instruction read: "In determining whether defendant's learning, skill and conduct fulfilled the duties imposed on him by law, as they have been stated to you, you are not permitted to set up arbitrarily, a standard of your own. The standard, I remind you, was set by the learning, skill and care ordinarily possessed and practiced by others of the same profession in good standing, in the same or similar locality and under similar circumstances at the same time. It follows, therefore, that the only way you may properly learn that standard is through evidence presented in this trial by physicians and surgeons called as expert witnesses."

839, 848 [285 P.2d 919].) Plaintiff has thus failed to demonstrate any error in the giving of BAJI 214-B (Revised) or that its having been given in conjunction with the res ipsa loquitur and conditional res ipsa loquitur instructions resulted in any contradiction or confusion.

## VII.

Plaintiff argues that "such pernicious elements as danger to the doctors' reputations should not have been allowed to enter into the case." Actually, it was plaintiff's trial counsel who interjected the issue in the course of her *voir dire* examination of the prospective jurors, not once but three times.[24] A colloquy outside of the presence of the jury took place in which plaintiff's counsel urged that the court's statement might "confuse the jury." The conclusion was that if plaintiff's counsel should raise any conjecture that there would be no damage to reputation or anything else

---

[24]*First time:* "[Plaintiff's trial attorney]: Let me ask you this, Mr. DePew [prospective juror]: Do you realize that this is not a criminal proceeding, this is a civil proceeding? Do you realize that? MR. DEPEW: Yes. [Plaintiff's attorney]: You understand that nobody's license is at stake, no doctor can lose his license. *He is not going to lose his reputation.* Do you understand that? MR. DEPEW: Well, I do now since you said it. [Plaintiff's attorney]: *He doesn't lose his staff memberships in any hospitals.* Do you understand that? [Trial attorney for Drs. Moore and Gstettenbauer]: This is unusual testimony from Mrs. Finan, your Honor. It is argumentative, also. THE COURT: The question was adequate, but don't pursue it. [Plaintiff's attorney]: All right, your Honor."

*Second time:* "[Plaintiff's attorney]: Do you understand Mrs. Sweany [prospective juror] that this is a civil, not a criminal matter, that there is no issue at stake here about anybody losing a license or losing privileges to practice or *losing face in the community?* [Trial attorney for Dr. Fainer]: I will object to that question. THE COURT: Sustained. The first part of it is all right. [Plaintiff's attorney]: Thank you."

*Third time:* "[Plaintiff's attorney]: Do you understand that malpractice is merely a word coined by the courts to describe negligence by a professional person? MR. HAMILTON [prospective juror]: Yes, ma'am. . . . [Plaintiff's attorney]: You understand this is civil and that there is nobody going to lose a license in this case? MR. HAMILTON: Yes, ma'am. [Plaintiff's attorney]: *Or be deprived of a hospital privilege.* [Dr. Fainer's attorney]: You[r] Honor, I am going to object. If counsel wants to state this is not a criminal matter, that's proper but I don't think these other things are proper. THE COURT: Yes, so long as they are aware that this proceeding, the only thing the jury will be required to do is to determine whether or not on the facts that they hear from the witness stand they are required to assess damages against the defendant and for the plaintiff and it isn't a question of jail sentences or anything of that nature. [Plaintiff's attorney]: *Might I inquire as to whether or not they realize no other kind of things like losing hospital privileges would be involved.* THE COURT: In this particular case? [Plaintiff's attorney]: Yes. THE COURT: Obviously they are intelligent enough to know that the effect of this case might in some way affect their rights other than in this case, but in this particular case you are called upon to determine nothing like that, nothing in relation to anything except the question of whether they have been guilty, one or more or all of negligence which proximately caused injury to the plaintiff for which money damages may be awarded. That's the only question you will have. [Plaintiff's attorney]: Your Honor, may we approach the bench at this time, please, sir? THE COURT: Surely." (Italics added.)

outside of the issues in the case, trouble would arise. The court instructed plaintiff's counsel that if she wished to pursue further questioning in the tenor previously indicated, she should confine herself to questions based upon the premise that criminal penalties and loss of license are not involved. ■■ "Injudicious statements by a trial judge do not necessarily indicate a denial of a fair trial." (*Zinn* v. *Ex-Cell-O Corp.* (1957) 148 Cal.App.2d 56, 86 [306 P.2d 1017].) ■■ No assignment of misconduct was made, nor was any request to instruct the jury to disregard the remark made. (Cf. *Pacific Coast A. Bureau* v. *Insurance Co.* (1931) 115 Cal.App. 583, 587 [2 P.2d 218].) If error was committed, its precipitating cause being plaintiff's counsel may not be overlooked. ■■ "A party who by his conduct induces the commission of error is estopped from asserting that the action of the court was erroneous." (*Smith* v. *Armstrong* (1927) 85 Cal.App. 624, 632 [260 P. 347]; see also generally, 3 Witkin, Cal. Procedure (1954) Appeal, pp. 2257-2261; cf. *Brown* v. *McCuan* (1942) 56 Cal.App.2d 35, 40 [132 P.2d 838]; *Hildebrand* v. *Los Angeles Junction Ry. Co.* (1960) 53 Cal.2d 826, 832 [3 Cal.Rptr. 313, 350 P.2d 65].) ■■ The error, if any, was furthermore expressly waived. After the jury and two alternates had been sworn to try the case, the court stated to all counsel: "Now, counsel, in view of the vagaries of the last two days I will invite a stipulation that the jury has in all respects been drawn, summoned, sworn and is now constituted according to law." All counsel, including plaintiff's, replied, "So stipulate." Additionally, the judge in his formal instructions gave BAJI 5 (Revised) and 23 (Revised).[25] (Cf. *Mercado* v. *Hoefler* (1961) 190 Cal.App.2d 12, 23 [11 Cal.Rptr. 787].) Based upon the foregoing reasons we find no error of which plaintiff can claim prejudice because the possible effect on the doctors' reputation crept into the case.

## VIII.

■■ Finally, plaintiff asserts that the forms of verdicts submitted to the jury were confusing and that fact, coupled with no instruction as to how they were to be used, resulted in a verdict or verdicts requiring reversal under *Mixon* v. *Riverview Hospital* (1967) 254 Cal.App.2d 364

---

[25]BAJI 5 (Revised) read: *"I have not intended by anything I have said or done* or by any questions that I may have asked *to intimate or suggest what you should find to be the facts,* or that I believe or disbelieve any witness who may have testified, and if anything that I have done or said has seemed to so indicate, you will disregard that intimation and form your own opinion without regard thereto." (Italics added.)

BAJI 23 (Revised) concerning statements of counsel concluded: "You must never assume or speculate to be true any insinuations carried or suggested by a question put to a witness by examining counsel or *by the court.* The examiner's question is not evidence except only as it explains or throws light upon the answer." (Italics added.)

[62 Cal.Rptr. 379]. We disagree. To begin with the postulate "non-instruction concerning the verdicts" is manifestly untrue. Furthermore, there is no showing, whatsoever, that the jury was confused.

Because of the multiple issues and multiple parties involved, some not involved in all causes of action or in all of the episodes alleged to have been negligent, the matter of drafting appropriate verdict forms was not an easy task. The forms used constituted the court's product after a very full conference with counsel wherein the various factors to be borne in mind were thoroughly discussed.

Six of the forms related to plaintiff and six to plaintiff's mother, Mrs. Sarah Rainer. Each set divided the issues into the "sponge issue," the "ureter issue," and "all other issues." Typical specimens are set forth below.[26] Corresponding forms as to the other two issues, separated as to plaintiff and her mother, were also given to the jury. Three verdicts exonerating all defendants, similar to the one shown in the footnote were returned against the mother on all three issues. As to plaintiff, the jury returned the verdict in her favor shown in the footnote, and two other verdicts favorable to all defendants on the "ureter issue" and "all remaining issues."

To a degree counsel explained the nature of the verdict forms in course of their arguments to the jury. The court also gave an explicit instruction on how the verdict forms were to be filled out.[27] By argument of counsel

---

[26] "[Entitled]: MARY MARGARET RAINER—GENERAL VERDICT—PART NUMBER 1. [Body]: TO BE USED ONLY IN CONNECTION WITH THE ISSUES INVOLVING THE SPONGE LEFT IN THE MAY 24, 1962 SURGERY: [¶] We, the jury impaneled to try the above entitled case, find for plaintiff Mary Margaret Rainer and against the defendants listed below around whose name a circle is drawn, and we assess plaintiff Mary Margaret Rainer's damages in connection with said sponge issues in the amount of $7,500.00: [¶] Community Memorial Hospital of San Buenaventura [which is encircled] [¶] James W. Moore [which is encircled] [¶] J. F. Gstettenbauer [which is encircled] [¶] David C. Fainer [¶] As to any defendant around whose name NO circle is drawn, we find for such defendant and against plaintiff Mary Margaret Rainer in connection with said sponge issues. [¶] Dated: 4 April 68 [¶] [signed] J. Douglas Moran Foreman of the Jury."

The verdict returned as to Sarah Rainer differed only in the portion directly pertaining to the finding, which read: "We, the jury impaneled to try the above entitled case, find for defendants and each of them and against plaintiff Sarah Rainer in connection with said sponge issues."

[27] It read: "Various claims for recovery have been made by each plaintiff in this case which, if proved, could involve one or more different defendants. For this reason, verdict forms for each plaintiff are being supplied to you in three different parts. The first part involves the sponge issues, the second part involves the ureter issues, and the third part involves all remaining issues not involving the sponge or ureter issues. [¶] For each part, you will be supplied with a form to be used for a plaintiff's

and by appropriate jury instructions the potential liability and damages which could be found by the jury were explicated. Plaintiff's counsel, who objected to any and all special verdicts and interrogatories being submitted to the jury, agreed that at least as to the sponge issue, there should be a separate verdict. The jury were told that defendants Moore, Gstettenbauer, and the hospital could all be held liable for the sponge having been left in plaintiff in the course of the May 24, 1962, operation. It was also explained by plaintiff's requested instructions (and expressly agreed to by her in the conference re verdict forms) that only defendants Dr. Moore and Dr. Gstettenbauer were involved and vulnerable to being held liable for damages on the ureter issue. As to defendant Fainer, there was an instruction that he could not be held liable at all unless the jury found him negligent in recommending the initial colectomy and ileostomy performed on June 10, 1960. The jury made no request for any clarification because of any difficulty in filling out the verdict forms.

The separation of the case into these three main issues and the supplying of the verdict forms was appropriate to a proper consideration of the case as dictated by the pleadings and the evidence presented. This is not the situation presented in *Mixon, supra*. *Mixon* itself states at 254 Cal.App.2d page 375: " 'In construing a verdict reference may be had to the pleadings, the evidence and the charge of the court.' (*Snodgrass* v. *Hand, supra,* 220 Cal. 446, 448 [31 P.2d 198].) See also *West* v. *Duncan, supra,* 205 Cal. App.2d 140, 143 [22 Cal.Rptr. 833]." We find no "manifest error" in the verdict forms used and returned by the jury.

### IX.

The judgment is reversed with directions to the trial court to permit plaintiff Mary Margaret Rainer to amend her pleadings and to litigate the issues of whether she (through her mother) validly consented (1) to the colectomy and ileostomy of June 20, 1960, as against defendants Drs. Fainer, Moore, and Gstettenbauer, and (2) to the coccygectomy on May 24, 1962, as against defendants Drs. Moore and Gstettenbauer; in all other respects the judgment is affirmed. Said plaintiff shall recover costs on appeal as against respondents Drs. Fainer, Moore, and Gstettenbauer; respondent Community Memorial Hospital shall recover its costs on appeal.

Kaus, P. J., and Stephens, J., concurred.

A petition for a rehearing was denied July 8, 1971, and the opinion was modified to read as printed above.

---

verdict, with a method of indicating the defendants involved, and a form to be used for a defense verdict. One of these forms must be used by you for each part. In other words, for you to return a verdict in this case, your foreman will have to sign one form for each part of the verdict for each plaintiff."